AMERICAN FOOD PRODUCTS CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 51153. Filed April 12, 1957.

*Irving I. Ginstling*, an officer, for the petitioner.
*Robert B. Wallace, Esq.*, for the respondent.

OPINION.

RICE, *Judge:* This proceeding involves the following deficiencies in income tax:

|  | Income tax deficiency |
|---|---|
| Fiscal period Jan. 1, 1948–Nov. 30, 1948 | $8,074.90 |
| Fiscal year ended Nov. 30, 1949 | 10,225.68 |
| Fiscal year ended Nov. 30, 1950 | 146.81 |

The sole issue is whether petitioner was a Western Hemisphere trade corporation within the meaning of section 109 of the 1939 Code during the years in issue.

All of the facts were stipulated, are so found, and are incorporated herein by this reference.

The petitioner was incorporated in December 1947 under the laws of the State of New York, and during the years in issue maintained offices in New York City, with branch offices in Caracas and Maracaibo, Venezuela. It filed corporate income tax returns for such years with the former collector of internal revenue for the second district of New York.

During such years, petitioner was engaged in selling the food products of Peerless Packers, Inc., to purchasers in Venezuela. Petitioner was the sole distributor of the products manufactured by that company in all Western Hemisphere countries except the continental United States. Petitioner purchased and sold for its own account.

The Peerless products sold by petitioner were manufactured specifically for sale in Venezuela. They were packed in hermetically sealed containers, and lithographed by the American Can Company, the manufacturer of such containers. The cans carried instructions for use of the products, a general informative text, and the following legend, all in Spanish: "Authorized by the Ministry of Health and Public Welfare under Free Sale, Nos. 4924 and 7309." The Venezuelan Government required prior approval of the text on the labels of all food products coming into the country and the indication thereon of the Ministry of Health free sale numbers.

Petitioner sent a special representative to Venezuela to negotiate for the sale of Peerless food products within that country. The representative spent a considerable period of time and a substantial amount of money in Venezuela appointing agents there to take orders, working with and training such agents and their employees, arrang-

ing for office facilities in Caracas and Maracaibo, doing marketing research, and arranging for advertising and merchandising campaigns.

A typical sales transaction was as follows: One of petitioner's agents in Venezuela obtained an order which contained the following statement on the order blank: "NOTE: This order is subject to confirmation of the factory; the merchandise travels for account and risk of the purchasers, who are responsible for the consular declarations." A letter of credit would then be established by the purchaser in petitioner's favor, payable in New York City, so that petitioner might obtain payment for the merchandise immediately after its delivery to the carrier. Petitioner then ordered the food products from Peerless Packers to be shipped directly to the ocean carrier. It prepared commercial invoices in triplicate, a consular invoice signed by the Venezuelan consul in New York, and a certificate of purity. It obtained an insurance policy covering marine risk and obtained a full set of "clean on board ocean" bills of lading. Such documents were then presented to the bank together with the letter of credit, and payment was then made by the bank to petitioner. The payments which petitioner received included cost of goods, insurance, and freight. Petitioner prepared a shipper's export declaration on each shipment for the United States Department of Commerce. When a shipment left New York, petitioner notified the purchaser in Venezuela by letter.

All of petitioner's business was done in the Western Hemisphere; and 90 per cent or more of its gross income for the taxable years in issue was derived from the active conduct of a trade or business.

On the returns which petitioner filed for the period here in question, it claimed that more than 95 per cent of its gross income was derived from sources in Venezuela, and hence claimed that it was a Western Hemisphere trade corporation and not subject to the surtax imposed on domestic corporations by section 15 of the Code. The respondent determined that petitioner was not a Western Hemisphere trade corporation because its income was derived from the sale of goods in the United States.

Section 15 imposes a surtax upon the income of all corporations, except Western Hemisphere trade corporations and certain other specified corporations not here material.[1] A Western Hemisphere trade corporation is defined in section 109 [2] as a domestic corporation,

---

[1] For years prior to 1950, Western Hemisphere trade corporations were exempt from the surtax; for 1950 and later years, the Code allowed a credit to such corporations, against such surtax.

[2] SEC. 109. WESTERN HEMISPHERE TRADE CORPORATIONS.

For the purposes of this chapter, the term "western hemisphere trade corporation" means a domestic corporation all of whose business is done in any country or countries in North,

all of whose business is done in the Western Hemisphere, if 95 per cent or more of its gross income was derived "from sources other than sources within the United States," and if 90 per cent or more of its gross income was derived from the active conduct of a trade or business.

The only issue raised here as to petitioner's qualifying as a Western Hemisphere trade corporation is respondent's determination that its income was derived in the United States and not from some outside Western Hemisphere sources. In support of his determination, the respondent argues that the courts have consistently held that the source of income from the sale of personal property is determined by the situs of the sale; and that the situs of sale is determined by where title to the property passed from the seller to the purchaser. He therefore concludes that since title to the property which petitioner sold passed to the purchasers in New York City when the goods were delivered to the ocean carriers, the sales took place in New York, and that the money paid at that time for the merchandise was income earned in the United States and not in Venezuela, the residence of the purchasers and the ultimate destination of the property sold.

Petitioner argues that the place where title to the property, sold by a Western Hemisphere trade corporation, passed to the purchaser should have no bearing on deciding what the source of such a corporation's income is. It says that when such a corporation clearly demonstrates that the purchasers of its goods are residents of some South American country, for example, and that the funds which paid for the goods came from them, then the source of the corporation's income is obviously from sources outside the United States. It argues, also, that the legislative history of section 109 supports its position; and it decries the inequities of the respondent's determination.

Contrary to the petitioner's contention, the enactment of section 109 was not an isolated legislative adventure on the part of Congress, but another step in a long history of special tax treatment for income received by domestic corporations and citizens of the United States from sources outside the United States.[3] Such special treatment began in the Revenue Act of 1918, sections 222 and 238, 40 Stat. 1057, which provided for a credit against United States income taxes for foreign income taxes paid by domestic corporations, citizens of the United States, and resident aliens. Subsequent revenue acts provided

---

Central, or South America, or in the West Indies, or in Newfoundland and which satisfies the following conditions:

(a) If 95 per centum or more of the gross income of such domestic corporation for the three-year period immediately preceding the close of the taxable year (or for such part of such period during which the corporation was in existence) was derived from sources other than sources within the United States; and

(b) If 90 per centum or more of its gross income for such period or such part thereof was derived from the active conduct of a trade or business.

[3] Baker and Hightower, "Western Hemisphere Corporations," 22 Tul. L. Rev. 229 (1947).

additional types of special treatment for certain income from foreign sources. The Second Revenue Act of 1940, 54 Stat. 974, which imposed an excess profits tax on domestic corporations, exempted from that tax those corporations which received 95 per cent or more of their gross income from sources other than sources within the United States. The language of Code section 727 (g) (1) added by that Act is identical with the language of section 109 (a).

The announced legislative purpose of section 109, as well as of many of the previous provisions in revenue acts providing special tax treatment for income received from sources outside of the United States, was to encourage domestic corporations to engage in foreign commerce by placing them in a more favorable competitive position with the corporations of other nations engaging in foreign trade.[4]

In conjunction with the special tax treatment of foreign income, section 119 of the Code, as did similar provisions in previous revenue acts, sets forth specific definitions with respect to income from sources within and without the United States. Treasury Regulations 111, section 29.109–1, provides, with respect to determining the source of income of Western Hemisphere trade corporations, that "[t]he gross income from sources without the United States and within the United States shall be determined as provided in section 119 and the regulations prescribed thereunder."

As the respondent has argued, the courts have consistently held, in interpreting section 119, that the income derived by a seller of goods is derived from the actual sale of the property; that the sale occurs when beneficial ownership and title to the goods passes to the purchaser; and that it is the situs of that event which determines where the sale takes place. *Compania General* v. *Collector*, 279 U. S. 306 (1929); *United States* v. *Balanovski*, 236 F. 2d 298 (C. A. 2, 1956), certiorari denied 352 U. S. 968 (1957); *Ronrico Corporation*, 44 B. T. A. 1130 (1941); *Piedras Negras Broadcasting Co.*, 43 B. T. A. 297 (1941), affd. 127 F. 2d 260 (C. A. 5, 1942); *East Coast Oil Co.*, 31 B. T. A. 558 (1934), affd. 85 F. 2d 322 (C. A. 5, 1936), certiorari denied 299 U. S. 608 (1936); and *Briskey Co.*, 29 B. T. A. 987 (1934), affd. 78 F. 2d 816 (C. A. 3, 1935); see also *Amtorg Trading Corporation* v. *Higgins*, 150 F. 2d 536 (C. A. 2, 1945). We are satisfied that Congress was fully aware of the passage of title test and of its acceptance by the courts when it wrote section 109.

This question of "the source of income" is essentially a problem of the law of sales rather than a question of taxation. And, despite whatever criticism may be directed against the passage of title test, we find no sound reason, at this point, to reject this well entrenched and long accepted doctrine in the law of sales, for purposes of deter-

[4] S. Rept. No. 1631, 77th Cong., 2d Sess. (1942), p. 32; H. Rept. No. 350, 67th Cong., 1st Sess. (1921), p. 8; S. Rept. No. 648, 76th Cong., 1st Sess. (1939), p. 9.

mining the source of income within the meaning of the statute before us.[5]

The petitioner has also argued that the fact that it maintained offices and agents in Venezuela who solicited orders is further proof that its income was derived from sources outside the United States. We find little appeal in that argument, particularly in view of the fact that its agents in Venezuela did not make binding sales contracts. Admittedly, the Treasury's position with respect to the importance of the place where the contract was made has varied. It at one time thought the place of execution of the contract to be controlling as to the source of income.[6] But the courts have never accepted the situs of the execution of the contract as determinative of source of income, and we feel the activities of petitioner's agents here have no bearing on that question. We therefore conclude that the respondent correctly determined that petitioner's income was not derived from sources outside the United States and it therefore does not qualify under the statute as a Western Hemisphere trade corporation.

Reviewed by the Court.

*Decision will be entered for the respondent.*

---

[5] See *United States* v. *Balanovski*, 236 F. 2d 298, 306; Surrey and Warren, "A. L. I. Income Tax Project," 66 Harv. L. Rev. 1161, 1196 (1953).

