**A. P. GREEN EXPORT COMPANY**

v.

**UNITED STATES.**

No. 126-59.

United States Court of Claims.
Dec. 1, 1960.

Henry C. Lowenhaupt, St. Louis, Mo., Lowenhaupt, Mattingly, Chasnoff, Freeman & Holland and Willson, Cunningham, McClellan & Gunn, St. Louis, Mo., on the brief, for plaintiff.

Eugene Emerson, Washington, D. C., with whom was Charles K. Rice, Asst. Atty. Gen., James P. Garland and Lyle M. Turner, Washington, D. C., on the brief, for defendant.

JONES, Chief Judge.

This is a suit for the refund of Federal income taxes for the years 1952 and 1953. Plaintiff claims that during this period it operated as a Western Hemisphere trade corporation as defined in section 109 of the Internal Revenue Code of 1939, amended by the Revenue Act of 1942, 56 Stat. 798, 838, 26 U.S.C.A. § 109, and qualified for the special tax credit allowed such corporations under section 26 of the Code, 26 U.S.C.A. § 26.

Section 109(a) and (b) provides as follows:

> "Sec. 109. Western hemisphere trade corporations.
>
> "For the purposes of this chapter, the term 'western hemisphere trade corporation' means a domestic corporation all of whose business is done in any country or countries in North, Central, or South America, or in the West Indies, or in Newfoundland and which satisfies the following conditions:
>
> "(a) If 95 per centum or more of the gross income of such domestic corporation for the three-year period immediately preceding the close of

the taxable year (or for such part of such period during which the corporation was in existence) was derived from sources other than sources within the United States; and

"(b) If 90 per centum or more of its gross income for such period or such part thereof was derived from the active conduct of a trade or business."

Section 26 of the Code, 53 Stat. 18, provides credits for corporations as follows:

"In the case of a corporation the following credits shall be allowed to the extent provided in the various sections imposing tax—

\* \* \* \* \* \*

" (i) \* \* \* In the case of a western hemisphere trade corporation (as defined in section 109)

\* \* \* \* \* \*

"(2) \* \* \* In the case of a taxable year beginning after March 31, 1951, and before April 1, 1954, an amount equal to 27 per centum of its normal-tax net income computed without regard to the credit provided in this subsection."—[As added 64 Stat. 906, 920, as amended 65 Stat. 452, 470.]

The problem presented to this court centers upon the sources of plaintiff's income for the taxable years. Both parties agree that section 119 of the Code is applicable to this determination.

"Sec. 119. Income from sources within United States.

\* \* \* \* \* \*

"(e) \* \* \* Gains, profits and income derived from the purchase of personal property within and its sale without the United States \* \* \* shall be *treated as derived entirely from sources within the country in which sold* \* \* \*." [Emphasis supplied.]

We are, thus, bound by the statute to determine specifically within which countries plaintiff's sales were made.

Detailed facts are set out in the findings which appear hereafter. We shall restate them only insofar as it facilitates consideration of the issues. Plaintiff is a wholly owned subsidiary of the A. P. Green Fire Brick Company, Inc., and was formed for the specific purpose of operating as a Western Hemisphere trade corporation. Its sole business consisted of buying fire brick and other refractory products from the parent company and selling them either to A. P. Green Fire Brick Company, Ltd., a fully owned Canadian subsidiary of the parent company, or to various unaffiliated customers in Central or South America. The plaintiff maintained no sales force or business establishment outside the United States. As orders or inquiries came in, plaintiff would respond with an offer describing the goods specifically. The goods were priced c. i. f. port of entry or occasionally f. o. b. factory, Mexico, Missouri, with all delivery costs figured in the price quotations. Plaintiff carefully noted in each offer:

"This quotation shall be binding upon A. P. Green Export Company upon acceptance by you and the placing of that acceptance in the mails.

"Title to these goods and responsibility for their shipment and safe carriage shall be in A. P. Green Export Company until their delivery to the customer at destination."

In due course these offers were accepted and returned by mail. Shipment was by public carrier on rail and water often under a straight bill of lading with the buyer named as consignee. In most cases freight charges were prepaid by the plaintiff. Insurance was purchased by the plaintiff for his benefit but the policy was negotiable and covered the goods 15 to 30 days beyond their arrival at the final port. Documents were surrendered against acceptance after delivery; payment was by 30-day sight drafts. Frequently, these drafts were discounted by plaintiff's bank before their acceptance, always with full recourse to the plaintiff. Standard commercial practices were followed throughout.

## I.  Legislative History

The Congress has limited the tax credit of section 109 to corporations 90

percent of whose income is "derived from the active conduct of a trade or business." Although it would appear that "trade or business" plainly comprehends a commercial export enterprise, the Government contends that "trade or business" under section 109 must involve *significant investment abroad;* that a simple export company such as the plaintiff with no business establishment outside the United States, lies beyond the statutory purview. As basis for this assertion, the Government cites a single example from the report of the Senate Committee on Finance which submitted section 109 as an amendment to the Internal Revenue Code, 56 Stat. 838. The example deals with a corporation engaged in mining activities in South America. Sen.Rep. No. 1631, 77th Cong., 2d Sess., 111 (1942). Bold definitional lines cannot be drawn with the meager legislative history available. We do not feel, however, that the effect of the statute should be severely restricted to the illustration used in the Committee Report since it in no way appears that the example was used for that purpose. An explanatory tale should not wag a statutory dog.

The announced legislative purpose of section 109 was to encourage domestic corporations to engage in foreign commerce. European countries had granted tax concessions to their nationals engaged in Western Hemisphere trade. The Congress was thus moved to grant similar tax credits to our domestic corporations thereby permitting them to compete on equal footing.[1] Without such tax assistance Western Hemisphere trade would in many instances not be profitable enough to pursue. American Food Products Corp. v. Commissioner, 28 T.C. 14. This was not an isolated legislative adventure on the part of the Congress, but another step in a long history of special tax treatment for income received by domestic corporations from sources outside the United States. Such treatment began with sections 222 and 238 of the Revenue Act of 1918, 40 Stat. 1057, providing credits for foreign income taxes paid by domestic corporations. Subsequently, section 152 of the 1939 Internal Revenue Code, 53 Stat. 880, 881, 26 U.S.C.A. § 152, was enacted providing tax benefits for "Pan-American trade corporations" which were domestic corporations engaged in the "active conduct of a trade or business in Central or South America." It was required of these corporations that they derive their income "from sources other than royalties, rents, dividends, interest, annuities, and gains from the sale or exchange of stock or securities." It is apparent that the Congress wrote this section with great specificity yet it imposed no requirement of foreign investment. In 1942, this section was deleted from the Code and section 109 was added. 56 Stat. 838. The prior Pan-American limitations were relaxed to include all countries in the Western Hemisphere other than the United States. New language used made section 109 coextensive in scope with section 727(g) (1) and (2) which exempted certain corporations from excess profits taxes, 26 U.S.C.A. Excess Profits Taxes, § 727(g) (1, 2). We are satisfied that the Congress did not intend to limit the effect of section 109 to railroads, mines, public utilities, or other businesses requiring foreign investment.

■ We note as of interest that the Congress reenacted the Western Hemisphere trade corporation provisions as section 921 of the 1954 Internal Revenue Code, 68A Stat. 290, 26 U.S.C.A. § 921, and the reports and hearings indicate

---

1. That the plaintiff could qualify as a Western Hemisphere trade corporation under section 109, Internal Revenue Code of 1939 appears clearly to be the result intended by the Congress. To hold otherwise would defeat the purpose of the statute—the encouragement of foreign trade by domestic corporations.

In effect, the Congress has said to the taxpayer: "If you meet the income and other requirements of the act, we will allow you certain tax benefits in order that you might enjoy as favorable a position as foreign corporations trading in the Western Hemisphere."

that the Congress knew that domestic export companies were adapting their operations to qualify as Western Hemisphere trade corporations. The facts indicate that the Congress believed these domestic corporations could qualify for the tax credit without substantial foreign investment.[2] Congressional afterthoughts are not controlling; neither may they be entirely disregarded, any more than executive interpretations may be disregarded. United States v. Freeman, 3 How. 556, 11 L.Ed. 724; Sioux Tribe of Indians v. United States, 316 U.S. 317, 62 S.Ct. 1095, 86 L.Ed. 1501; United States v. Stafoff, 260 U.S. 477, 43 S.Ct. 197, 67 L.Ed. 358; First Nat. Bank v. Missouri, 263 U.S. 640, 44 S.Ct. 213, 68 L.Ed. 486; see also Equitable Life Assurance Society of United States v. United States, Ct.Cl., 181 F.Supp. 241, concurring opinion of Judge Littleton.

We · reject the Government's premise for it is our belief that "significant foreign investment" may not reasonably be implied in the term "trade or business" of section 109 of the Code. Apart from this contention the Government does not further question that an active commercial export enterprise is "trade or business" under this section. These conclusions presage our finding that an export business may be eligible for the tax benefits accorded Western Hemisphere trade corporations.

## II. Place of Sale

The place of sale is a conclusion which follows the application of the proper test to a series of commercial transactions. The choice of the proper test becomes very difficult when the effects of the determination sought go beyond the traditional area of the law of sales.

The title-passage test as determinative of where a sale has occurred, and, by reference to section 119, where plaintiff's income was derived, is open to serious criticism, for it causes the incidence of the United States tax to depend upon the vagaries of the law of sales.[3] The time and place of passage of title to ascertained goods is subject to the consensual arrangements of the parties. Williston on Sales, sec. 259, 2d ed.; cf. Uniform Sales Act, sec. 18. This all-important consent is most frequently expressed by the parties, but if not it is determined at the time of controversy by a number of presumptions set up by the law of sales. These fairly complex rules regarding passage of title are extremely important in determining such questions as the risk of loss of goods in transit, or the rights of successive creditors, but have little or no bearing on the question of where income is earned and how it should be apportioned among the various countries in which business is conducted. See American Express Co. v. Iowa, 196 U.S. 133, 25 S.Ct. 182, 49 L.Ed. 417; Superior Oil Co. v. Mississippi, 280 U.S. 390, 50 S.Ct. 169, 74 L.Ed. 504. The title-passage test has been further criticized as imposing inequitable tax burdens on taxpayers engaged in substantially similar transactions, such as upon exporters, some of whose customers require that property in the goods passes in the United States. See Hearings before the House Committee on Ways and Means on Forty Topics Pertaining to the General Revision of the Internal Revenue Code, 83d Cong., 1st Sess., Part II, 1455–1484 (1953).

Whatever its weaknesses, however, the title-passage test as determinative of place of sale and source of income has been overwhelmingly adopted by the courts in recent decisions. Compania General de Tabacos de Filipinas v. Collector, 279 U.S. 306, 49 S.Ct. 304, 73 L.Ed. 704; East Coast Oil Co. v. Commissioner, 31 B.T.A. 558, affirmed, 5 Cir., 85 F.2d 322, certiorari denied, Helvering v. East Coast Oil Co., 299 U.S. 608, 57 S.Ct. 234, 81 L.Ed. 449. Hazleton Corp. v. Commissioner, 36 B.T.A. 908; Ronrico Corp. v. Commissioner, 44 B.T. A. 1130; United States v. Balanovski, 2

---

2. Complete discussion of the legislative history filed with the record of the case as appendix A.

3. Complete discussion filed with the record of the case as appendix B.

Cir., 236 F.2d 298, reversing in part, D.C., 131 F.Supp. 898; American Food Products Corp. v. Commissioner, 28 T.C. 14. We believe no other suitable test providing an adequate degree of certainty for the taxpayer has been proposed. The use of vague "contacts" or "substance of the transaction" criteria would make it more difficult for corporations engaged in Western Hemisphere trade to plan their operations so as to receive the deductions granted them only if they derive their income from sources outside the United States. Tests based upon the destination of the property sold or on the locus of the selling activity are equally vulnerable to the charge of unfair discrimination. See United States v. Balanovski, 236 F.2d 298, at page 305.

If then the passage of title does control the place of sale and the source of income, logic demands that we specify the place where title to the goods passed. It is a black letter rule of the law of sales that title to specific goods passes from the seller to the buyer in any manner and on any condition explicitly agreed on by the parties. Amtorg Trading Corp. v. Higgins, 2 Cir., 150 F.2d 536; United States v. Balanovski, supra; Williston on Sales, sec. 259, rev. ed. (1948); cf. Uniform Commercial Code, sec. 2–401. Examination of the sales contracts before us shows that the parties expressed their intentions as follows:

> "Title to these goods and the responsibility for their shipment and safe carriage shall be in the A. P. Green Export Company until their delivery to the customer at destination."

Such a clear statement, undoubtedly binding upon the parties in an ordinary sales or contract dispute, would seem to end our inquiry into the intention of the parties. But the Government urges that the terms of shipment raise presumptions that the parties intended to pass title in the United States contrary to their stated intentions, and that we must acknowledge the effect of these presumptions. We find no merit in this conten-

tion. It is true that in some instances the shipping terms, particularly the c.i.f. (cost, insurance, and freight) transactions, indicate presumptively that title passed at the place of shipment. Ronrico Corp. v. Commissioner, supra; East Coast Oil Co. v. Commissioner, supra; Williston on Sales, supra, sec. 280c. But the authorities are agreed that these presumptions are useful in ascertaining intention only if no *express* intention of the parties appears. See Williston on Sales, supra, sec. 261, et seq., and cases cited. The Government does not suggest the expressions in the contract were fraudulent. It does maintain that we must disregard the *stated* intentions of the parties in determining where title passed because the ultimate motive for these statements was the plaintiff's desire to avoid a tax.

We believe the Government has erred in failing to distinguish two separate legal consequences flowing from the same act of expression by the parties, the consequences being the passage of title and the avoidance of a tax. Title passes in a sales transaction as a result of the mutual arrangement of the buyer and the seller, whatever the reason or motivation for the consent. It would be an unjustified distortion of this law for us to disregard the parties' stated intention to pass title outside the United States because they were principally motivated by a desire to avoid a tax. This is *not* to say that under the tax law, in an atmosphere of tax avoidance, we may not find that the passage of title no longer governs the place of sale and the source of income. The next section of our opinion covers this problem. It is perfectly clear, however, that the parties intended to pass title to the goods outside the United States; this being determinative, we find that title to the goods did pass outside the United States.

### III. Tax Avoidance

We now come to the problem of tax avoidance to which we have just referred. The Government urges that we examine the transactions here in the penetrating light of Gregory v. Helvering,

293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596, for it claims that plaintiff's principal purpose in organizing and operating the export corporation was tax avoidance.

■ Organizing a Western Hemisphere trade corporation does not constitute tax avoidance and the Commissioner of Internal Revenue has so ruled, as follows:

"The creation of a new domestic corporation to carry on the business in the Western Hemisphere (other than in the United States) of an existing domestic corporation does not constitute tax avoidance within the meaning of Section 129 of the Internal Revenue Code, even though the new corporation was created for the principal purpose of gaining the tax benefits provided by the first exception in section 115(b) of the Code relating to exception from surtax in the case of Western Hemisphere trade corporations and by section 727(g) of the Code, relating to certain domestic corporations which are exempt from excess profits tax." [I.T. 3757, 1945 Cum.Bull. 200.]

Neither the motives, occasion for, nor the time of the *organization* of the plaintiff corporation affects its eligibility for tax relief. The Code provisions themselves have created this new business norm, a norm motivated entirely by a tax result.

The questions concerning the methods of operating the export corporation are not so easily answered. The facts show that the plaintiff delayed the passage of title with at least one eye on the Revenue Code. See finding 25. May we, therefore, depart from the title-passage test in determining the place of sale and source of plaintiff's income? The defendant says we must and submits in support a ruling by the Commissioner which states:

"Where the sales transaction is arranged for the primary purpose of tax avoidance, the foregoing rules [passage of title test] will not be applied. In such case, all factors of the transaction such as negotiations, execution of the agreement, location of the property and place of payment will be considered, and the sale will be treated as having been consummated at the place where the substance of the sale occurred." [G. C.M. 25131, 1947–2 Cum.Bull. 85.]

The defendant also relies on United States v. Balanovski, D.C., 131 F.Supp. 898, reversed in part, 2 Cir., 236 F.2d 298, 306, certiorari denied, 352 U.S. 968, 77 S.Ct. 357, 1 L.Ed.2d 322. At first glance the Balanovski case seems to give little support to the defendant's position. There, the facts showed that goods were purchased in the United States and sold to the Argentine Government. In determining the source of income of the Argentine broker, Balanovski, the district court applied a "substance of the transaction" test and determined that Balanovski had not earned income in the United States. The Court of Appeals for the Second Circuit reversed the district court on the exact point of where the sales had taken place. It rejected the "substance of the transaction" test and rested its decision on the traditional ground of looking to the point of passage of title.

But the final passage of Judge Clark's opinion in Balanovski, supra, is notable:

"Of course this test [title-passage] may present problems, as where passage of title is formally delayed to avoid taxes. Hence it is not necessary, nor is it desirable, to require rigid adherence to this test under all circumstances."

The Government concludes from this that in instances where passage of title is formally delayed to avoid taxes the court would feel free to look beyond the question of where title passed. Furthermore, it is suggested that the court tacitly accepted a "substance of the transaction" criterion as only by examining the indicia of substance would it be possible to decide whether passage of title was delayed merely to avoid taxes.

Along with this we must consider the statement of Judge Learned Hand in the

Gregory case that "a transaction, otherwise within an exception of the tax law, does not lose its immunity, because it is actuated by a desire to avoid, or, if one choose, to evade, taxation. Any one may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury; there is not even a patriotic duty to increase one's taxes." 69 F.2d 809, at page 810, citing United States v. Isham, 17 Wall. 496, 506, 21 L.Ed. 728; Bullen v. Wisconsin, 240 U.S. 625, 36 S.Ct. 473, 60 L.Ed. 830; quoted with approval, Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596; see also Superior Oil Co. v. Mississippi, 280 U.S. 390, 50 S.Ct. 169, 74 L.Ed. 504. It is undeniable that this is a doctrine essential to industry and commerce in a society like our own in which as far as possible business is always shaped to the form best suited to keep down taxes. Commissioner of Internal Revenue v. National Carbide Corp., 2 Cir., 167 F.2d 304, affirmed 336 U.S. 422, 69 S.Ct. 726, 93 L.Ed. 799. The question always is whether the transaction under scrutiny is in fact what it appears to be in form. A corporate reorganization may be illusory; a contract of sale may be intended only to deceive others. In such cases the transaction as a whole is different from its appearance. It is the intent that controls, but the intent which counts is one which contradicts the apparent transaction, not the intent to escape taxation. Chisholm v. Commissioner, 2 Cir., 79 F.2d 14.

■ Why the parties in the present case wished to make the sales as they did is one thing, but that is irrelevant under the Gregory case so long as the consummated agreements were no different than they purported to be, and provided the retention of title was not a sham but had a commercial purpose apart from the expected tax consequences. Granite Trust Co. v. United States, 5 Cir., 238 F.2d 670; Kocin v. United States, 2 Cir., 187 F.2d 707; Weller v. Commissioner, 3 Cir., 270 F.2d 294; Knetsch v. United States, 81 S.Ct. 132; cf. Stanton v. Commissioner, 34 T.C. 1. Plaintiff's operations meet these tests. The facts show that the parties did intend title to pass outside the United States. There was no sham. Retaining title until delivery served a legitimate business purpose apart from the expected tax consequences. A moment's contemplation of the current headline disputes among countries all over the world underscores the prudence of exporters who retain title to goods until delivery. A sudden trade embargo, a seizure or a nationalization of an industry, a paralyzing nationwide strike—under these circumstances the exporter who retains title diverts his shipments with little difficulty to friendlier ports and markets. Of additional significance is the fact that retaining title permits the shipper to insure his goods in the United States.[4] If loss occurs he can recover directly and in dollars with the obvious benefits of avoiding circuitous litigation and the fluctuations of foreign currency.

On the other hand, we recognize that plaintiff would have received certain other benefits by passing title to his goods in the United States. Plaintiff was faced with a choice of two legitimate courses of conduct, either of which would be commercially sound and justifiable. We are not prepared to say that in this situation plaintiff was bound to choose that course which would best pay the Treasury.

Our conclusion from all of the above is that the sales were made outside the United States. However, our conclusion would be no different if we followed the defendant's suggestion and went beyond the passage of title to the other elements "of substance" in the transactions. Or-

---

4. The law of several countries requires importers to insure goods subject to import in national insurance companies. If the seller retains ownership such laws are not applicable. See Costa Rico, Ley de Monopolio de Seguros, Oct. 5, 1924; Argentina, Decreto no. 12988, effective June 27, 1947.

ders were solicited outside the United States. In every case, the contract of sale was made outside the United States; the destinations of the goods and the competitive markets for the goods were outside the United States. In most cases, the place of payment was outside the United States.

Accordingly, the plaintiff is entitled to recover its back taxes for the years 1952 and 1953, together with interest as provided by law. Judgment will be entered to that effect.

The exact amount of recovery will be determined pursuant to Rule 38(c) of the Rules of this court, 28 U.S.C.A.

It is so ordered.

DURFEE, LARAMORE, and MADDEN, Judges, concur.

WHITAKER, Judge, took no part in the consideration and decision of this case.