COMMISSIONER OF INTERNAL REVENUE, Petitioner,

v.

HAMMOND ORGAN WESTERN EXPORT CORPORATION, Respondent.

No. 14324.

United States Court of Appeals Seventh Circuit.

Feb. 14, 1964.

Louis F. Oberdorfer, Asst. Atty. Gen., Tax Division, Harold C. Wilkenfeld, Atty. U. S. Dept. of Justice, Washington, D. C., John B. Jones, Jr., Acting Asst. Atty. Gen., Lee A. Jackson, Martin B. Cowan, Atty. Dept. of Justice, Washington, D. C., for petitioner.

Ira T. Wender, New York City, Roger M. Quinnan, New York City, for respondent.

Before DUFFY, KILEY and SWYGERT, Circuit Judges.

DUFFY, Circuit Judge.

The issue here for decision is whether taxpayer qualified as a Western Hemisphere Trade Corporation under Section 109 of the Internal Revenue Code of 1939 for the taxable year ended March 31, 1954, and Section 921 of the Internal Revenue Code of 1954 for the taxable years ended March 31, 1955, 1956, 1957 and 1958. If taxpayer qualifies, it is also exempt from excess profits tax pursuant to Section 454(f) of the 1939 Code, for the year ended March 31, 1954. The Tax Court held that taxpayer did so qualify.

Hammond Organ Western Export Corporation (taxpayer) was incorporated in the State of Delaware and has its principal office at 4200 West Diversey Avenue, Chicago, Illinois. It filed its income tax returns on an accrual method of accounting.

Hammond Organ Company (H. O. C.) is a Delaware corporation with its principal office located at 4200 West Diversey Avenue, Chicago, Illinois. H. O. C. is engaged in the invention, development, manufacture and sale of electrical musical instruments. H. O. C. products were sold under the brand name "Hammond Organ." These instruments were sold to customers in the United States and in foreign countries.

Prior to May 1952, H. O. C. became dissatisfied with its Canadian distributor, Northern Electric Company, Ltd. (Northern), due largely to the volume of sales in Canada. Also, Canadian dealers were dissatisfied because many of them felt Northern was not organized to effectively distribute Hammond organs.

The management of H. O. C. was aware of the tax advantages available to a Western Hemisphere Trade Corporation. Investigation was made exploring the possibility of forming a new corporation which would not only solve its distribution problems in Canada, but would also qualify as a Western Hemisphere Trade Corporation.

At a meeting of the Board of Directors of H. O. C., the following resolution was adopted:

"RESOLVED, That this Corporation cause the incorporation under the laws of Delaware of a corporation to conduct business as a Western Hemisphere Trade Corporation as defined by the federal Internal Revenue Code, and

"BE IT RESOLVED FURTHER, That such corporation be organized under the name of Hammond Instrument Western Export Corporation, * * "

The management of H. O. C. understood that in order for taxpayer to qualify as a Western Hemisphere Trade Corporation, taxpayer would be required to derive at least 95 per cent of its income from sources outside of the United States but within the western hemisphere. It believed this requirement could be satisfied by having taxpayer retain title, assume all the risk of loss or damage to the goods in transit, until the goods were delivered to the buyer outside of the United States. Taxpayer adopted this system. It intended to and did assume the risk of loss or damage as stated, and understood no sale would be considered consummated until the merchandise had been delivered in good condition to the customer.

During the taxable years, taxpayer's business consisted of purchasing Hammond organs exclusively from H. O. C. and selling these organs to customers located in North America, South America, Central America, the West Indies and Newfoundland. Taxpayer did not buy from nor sell to any persons or concerns located in countries outside of the western hemisphere.

The United States Court of Claims and the Tax Court of the United States have uniformly held that domestic corporations like the taxpayer, engaged in export trade from an office in the United States, satisfy the active trade or business test of Sections 109 and 454(f) of the 1939 Code, and Section 921 of the 1954 Code. A. P. Green Export Company v. United States, 284 F.2d 383 (Ct. Cl., 1960); Topps of Canada, Ltd. v. Commissioner, 36 T.C. 326 (1961); Pan American Eutectic Welding Alloys Co. v. Commissioner, 36 T.C. 284 (1961); Barber-Greene Americas, Inc. v. Commissioner, 35 T.C. 365 (1960).

In spite of the solid array of court decisions to the contrary, the Commissioner urges the decision of the Tax Court herein was erroneous. Much legislative history is cited. Counsel for the Commissioner claims the legislative history submitted in this case is more complete than in cases which have been submitted to other courts.

In effect, the Commissioner is seeking from this Court, a holding which would be in conflict with the decision of every court which has considered the issues here presented.

The Commissioner makes two principal arguments, first, that taxpayer did not derive 90 per cent or more of its gross income from the active conduct of a trade or business outside of the United States, and second, that taxpayer did not derive 95 per cent or more of its gross income from sources outside the United States.

We think the applicable statutory provisions are clear. They require only that 90 per cent or more of the gross income

be derived from the active conduct of a trade or business. The statutes do not specify the geographical place where the business is to be conducted. If the legislative history proves anything, it is that Congress deliberately did not restrict the geographical place at which the business would be conducted.

The source of income depends on the place where the goods are sold. It is well established by many court decisions that the place of sale is where the title and risk of loss passed from the seller to the buyer. The Tax Court found, and the Commissioner concedes, that on all of taxpayer's sales, the title of the goods sold passed outside of the United States.

The Commissioner seeks to substitute a somewhat vague "substance of the transaction test." However, in addition to the well established rule heretofore mentioned, in determining place of sale, there were substantial economic consequences and commercial significance to the retention of title to goods until such goods arrived in the buyer's country. These include liability for loss or damage in transit, control of goods in transit, and rights and remedies in the event of failure to pay or insolvency.

The only restriction as to geographical area in the Western Hemisphere Trade Corporation provisions is that all business be done in countries of the western hemisphere. Since the United States of America is a country in the western hemisphere, it is a country in which business may be conducted under the Western Hemisphere Trade Corporation's provisions.

Congress completely overhauled United States taxation of foreign source income in adopting the Revenue Act of 1962. The avowed purpose of Congress was to close loopholes which had developed in the tax treatment of income from foreign sources.

As far as we are advised, no proposal was considered to change the Western Hemisphere Trade Corporation's provisions although most of the court deci-

sions hereinbefore quoted had been handed down prior to the adoption of the Revenue Act of 1962.

Considering the great attention given by the Treasury and by Congress to the areas of taxation of foreign source income in the 1962 legislation, it is difficult to understand why a simple amendment to Section 921 would not have been proposed by the Treasury if there were any merit to the position which the Commissioner has taken in this and similar litigation.

We think the Tax Court was correct in holding the income from taxpayer's sales is from sources outside of the United States. We find no error in law and the conclusions drawn by the Tax Court. The decision of the Tax Court is

Affirmed.