MIAMI PURCHASING SERVICE CORP., INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

MIAMI AVIATION SERVICE, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3934–79, 3935–79.    Filed May 20, 1981.

*Craig Donoff*, for the petitioners.
*David M. Kirsch*, for the respondent.

STERRETT, *Judge*: Respondent determined deficiencies in petitioners' Federal income taxes as follows:

| Docket No. | Petitioner | Year | Deficiency |
|---|---|---|---|
| 3934–79 | Miami Purchasng Service Corp., Inc | 1974 | $2,889.94 |
| | | 1975 | 6,284.41 |
| | | 1976 | 6,986.84 |
| | | | 16,161.19 |
| 3935–79 | Miami Aviation Service, Inc | 1974 | 5,361.74 |
| | | 1975 | 13,475.18 |
| | | 1976 | 8,713.69 |
| | | | 27,550.61 |

These cases have been consolidated for trial, briefing, and opinion.

The issues remaining for our decision are: (1) Whether the statute of limitations bars the assessment and collection of any deficiencies against the petitioners; and (2) whether more than 5 percent of each petitioner's gross income for the 3-year period immediately preceding the close of each taxable year in issue was derived from sources within the United States so as to preclude petitioners from claiming the Western Hemisphere trade corporation deduction allowed under section 922, I.R.C. 1954.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts together with the exhibits attached thereto are incorporated herein by this reference.

Petitioners Miami Purchasing Service Corp., Inc. (Purchasing), and Miami Aviation Service, Inc. (Aviation), are corporations organized under the laws of the State of Florida, with their principal offices located in Miami, Fla., at the time of filing the petitions herein. Both filed their Federal corporate income tax returns for the taxable years ended December 31, 1974, 1975, and 1976 with the Internal Revenue Service Center, Chamblee, Ga.

Purchasing filed its 1974 Federal income tax return, Form

1120, on February 20, 1975. Aviation filed its 1974 Federal income tax return, Form 1120, on March 17, 1975. On February 6, 1978, Purchasing and respondent timely executed a Form 872 to extend the statute of limitations for the taxable year ended December 31, 1974, until December 31, 1978. On the same day, Aviation and respondent timely executed a Form 872 to extend the statute of limitations for the taxable year ended December 31, 1974, to December 31, 1978. The statutory notices of deficiency, upon which these cases are based, were mailed to the petitioners on December 26, 1978.

### Miami Purchasing Service Corp., Inc.

Purchasing conducted all of its business for each taxable year in issue within the Western Hemisphere. Ninety percent of Purchasing's gross income for the 3-year period immediately preceding the close of each taxable year in issue was derived from the active conduct of a trade or business.

Purchasing is not a domestic sales organization. It does not advertise in the United States nor engage in domestic sales promotion. Purchasing's sales force, at least some of whom are located in Latin America, travel extensively to promote American manufactured goods and services and to negotiate terms of sale. Only a minor portion of Purchasing's sales has been to domestic customers since it began in business in 1962.

During the years in issue, Purchasing contacted the Government of Costa Rica with respect to the sale of anti-riot equipment and other goods. Purchasing did not enter into any written agreement with the Government of Costa Rica. In order to accommodate Costa Rica, Purchasing agreed to structure the transactions through Double A Leasing Corp., a local Miami corporation. As a result, a substantial part of Purchasing's sales during the years in issue was to Double A Leasing Corp. Purchasing's gross receipts and sales to Double A Leasing for the period 1972 through 1976 were as follows:

| Year | Gross receipts[1] | Sales to Double A |
|------|------------------|-------------------|
| 1972 | $165,201 | Not available |
| 1973 | 661,949 | Not available |
| 1974 | 506,157 | $93,867 |
| 1975 | 1,113,226 | 80,895 |
| 1976 | 1,263,556 | 170,891 |

Invoices prepared by Purchasing were the only written evidence of transactions between Purchasing and Double A Leasing. A box with the term "F.O.B. ___ " was printed on all of Purchasing's invoices. Purchasing's invoices evidencing sales to Double A Leasing provided that the order was placed verbally; that payment was to be by letter of credit; that shipping terms were to be "F.O.B. Miami, Fla."; and that the indicated goods were to be shipped directly to Costa Rica via LACSA Airlines, a Costa Rican common carrier.

### Miami Aviation Service, Inc.

Aviation conducted all of its business for each taxable year in issue within the Western Hemisphere. Ninety percent of Aviation's gross income for the 3-year period immediately preceding the close of each taxable year in issue was derived from the active conduct of a trade or business. During the years in issue, Aviation was the parent company of Purchasing, owning 75 percent of its outstanding shares.

Aviation is not a domestic sales organization. It does not advertise in the United States nor engage in domestic sales promotion. Aviation's sales personnel, at least some of whom are located in Latin America, travel extensively to promote American manufactured goods and services. Only a minor portion of Aviation's sales has been to domestic customers since it began in business in 1962.

Aviation was involved in extensive sales to the Panamanian

---

[1] Sec. 921, at issue herein, speaks in terms of gross income derived from sources without the United States. The parties have stipulated that the ratio of gross receipts to gross income is uniform throughout all aspects of petitioner's business activity. Since the stipulated figures are in gross-receipts terms, we interpret this stipulation to mean that the parties apparently have agreed that we should look to gross receipts rather than gross income to see whether the requirements of sec. 921 have been satisfied. We accept this stipulation only because, in the final analysis, it will not alter our result.

National Guard. During the years in issue, the business activities of Aviation can be summarized as follows:

| Year | Gross receipts[2] | Sales to Panamanian National Guard |
|------|------------------|-----------------------------------|
| 1972 | $535,828 | Not available |
| 1973 | 1,548,364 | Not available |
| 1974 | 1,264,514 | $668,930 |
| 1975 | 2,105,100 | 1,090,442 |
| 1976 | 1,761,142 | 140,891 |

Goods sold to the Panamanian National Guard were physically delivered aboard a Panamanian National Guard aircraft at Miami International Airport, Miami, Fla. Employees of Aviation loaded some goods aboard these aircraft. Other goods were installed on the Panamanian aircraft by FAA licensed mechanics working under a contract agreement with Aviation. The percentage breakdown for the above two categories was as follows:

| | 1974 | 1975 | 1976 |
|------|------|------|------|
| Loaded aboard | 23.5% | 28.2% | 6.6% |
| Installed | 29.4% | 23.6% | 1.4% |
| Total (as percent of year's receipts) | 52.9% | 51.8% | 8.0% |

The goods loaded or installed on the Panamanian aircraft were aircraft spare parts needed for maintenance and service. The parts included tires, starters, generators, brakes, compressors, fuel controls, carburetors, cylinders, entire engines, and any other spare parts that the aircraft might need.

With respect to goods sold to the Panamanian Government, Aviation carried a marine open cargo insurance policy. As a shipment was sent, Aviation would inform the insurance company of the contents and value of the goods shipped. The policy automatically covered all shipments in which Aviation had an insurable interest, but expressly excluded from coverage "shipments sold by the Assured [Aviation] on F.O.B.; F.A.S.; cost and freight or other terms whereby the Assured is not obliged to furnish Ocean Marine Insurance and excluding shipments purchased by the Assured on terms which include insurance."

---

[2]See note 1 *supra*

The policy also covered "all shipments which the Assured may be instructed to insure provided such instructions are given in writing prior to sailing of vessel and before any known or reported loss or accident." Coverage under the policy would begin from the time the goods left the warehouse at the point of commencement of transit, would continue during the ordinary course of transit, and would extend until the goods were delivered to the warehouse at the point of destination.

In addition, during the years in issue, Aviation sold goods to Western Hemisphere countries other than Panama. Such goods were shipped on commercial carriers.

Aviation's invoices were the only written evidence of the transactions between the petitioner corporation and its customers. Aviation's invoices provided the manner in which the customer's order was placed; payment terms; shipping terms; and manner of shipment. Shipping terms were indicated in a printed box on the invoice entitled "F.O.B." Normally, the invoice preparer at Aviation's office would type "Miami, Florida" in the box, but sometimes the term "Panama," "C.I.F. Panama," "Santo Domingo," or "Factory" would appear.

## OPINION

At the outset, we must determine whether the statute of limitations for the taxable year ended December 31, 1974, had run at the time that respondent mailed the notices of deficiency. Petitioners have properly pleaded the statute of limitations as an affirmative defense that could bar the assessment and collection of a deficiency. Petitioners have the burden of proving when the return was filed and when the statute of limitations expired. *Robinson v. Commissioner*, 57 T.C. 735, 737 (1972). Respondent bears the burden of proving that any extension of the statute of limitations is applicable. See *Bonwit Teller & Co. v. Commissioner*, 10 B.T.A. 1300 (1928); *Farmers Feed Co. v. Commissioner*, 10 B.T.A. 1069 (1928).

Section 6501, I.R.C. 1954, provides in pertinent part:

SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION.

(a) GENERAL RULE.—Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed * * * and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period.

(b) TIME RETURN DEEMED FILED.—

(1) EARLY RETURN.—For purposes of this section, a return of tax imposed by this title * * * filed before the last day prescribed by law or by regulations promulgated pursuant to law for the filing thereof, shall be considered as filed on such last day.

*     *     *     *     *     *     *

(c) EXCEPTIONS.—

*     *     *     *     *     *     *

(4) EXTENSION BY AGREEMENT.—Where, before the expiration of the time prescribed in this section for the assessment of any tax imposed by this title, except the estate tax provided in chapter 11, both the Secretary and the taxpayer have consented in writing to its assessment after such time, the tax may be assessed at any time prior to the expiration of the period agreed upon. The period so agreed upon may be extended by subsequent agreements in writing made before the expiration of the period previously agreed upon.

The last day on which petitioners could timely file their tax returns for the taxable year ended December 31, 1974, was March 15, 1975. See sec. 6072(b). Under section 6501(a) and (b)(1), the normal statute of limitations would therefore have expired on March 15, 1978. However, on February 6, 1978, both Purchasing and Aviation entered into agreements with respondent to extend the period of limitations until December 31, 1978. See sec. 6501(c)(4). Because the statutory notices in both of these cases were mailed on December 26, 1978, prior to the expiration of the agreed limitations period, we find that respondent has carried his burden of proving the applicability of section 6501(c)(4). Therefore, the statute of limitations is not a bar to the assessment and collection of any deficiency against the petitioners.

The central issue that we must address is whether petitioners were Western Hemisphere trade corporations as defined in section 921 during the taxable years 1974, 1975, and 1976 so as to qualify for the special deduction permitted under section 922. Petitioners bear the burden of proving that they are entitled to the deduction claimed on their returns. *Welch v. Helvering*, 290 U.S. 111 (1933).[3]

---

[3]On brief, petitioners alleged that "Respondent * * * had the burden of proving that title to Petitioners' goods passed within the United States so that the sale was consummated in the United States." This statement reflects a misapprehension on petitioners' part with respect to where the burden of proof lies. At this late date, it cannot sincerely be disputed that petitioners bear the burden of proving this and all other facts which are necessary for us to find that they come within the legislative requisites of secs. 921 and 922.

In section 921, the term "Western Hemisphere trade corporation" is defined as follows:

SEC. 921. DEFINITION OF WESTERN HEMISPHERE TRADE CORPORATIONS.

For purposes of this subtitle, the term "Western Hemisphere trade corporation" means a domestic corporation all of whose business (other than incidental purchases) is done in any country or countries in North, Central, or South America, or in the West Indies, and which satisfies the following conditions:

(1) if 95 percent or more of the gross income of such domestic corporation for the 3-year period immediately preceding the close of the taxable year (or for such part of such period during which the corporation was in existence) was derived from sources without the United States; and

(2) if 90 percent or more of its gross income for such period or such part thereof was derived from the active conduct of a trade or business.

The parties have stipulated that both Purchasing and Aviation are domestic corporations, that they conducted all of their business for each taxable year in issue within the Western Hemisphere, and that 90 percent of their gross incomes for the 3-year period preceding the close of each taxable year in issue was derived from the active conduct of the exporting business.

We are left to consider whether petitioners satisfied the test in section 921(1) which requires that 95 percent or more of the corporations' gross incomes be from sources without the United States (non-U.S. sources). To determine whether income is from sources within or without the United States, section 1.921–1(c), Income Tax Regs., refers to the definitions in sections 861 and following, and the regulations thereunder. In section 862(a)(6), "gross income from sources without the United States" is defined to include "gains, profits, and income derived from the purchase of personal property within the United States and its sale or exchange without the United States."[4] The problem of identifying the place of sale is addressed in section 1.861–7(c), Income Tax Regs., which states in pertinent part:

Sec. 1.861–7. Sale of personal property.

(c) *Country in which sold.* For the purposes of * * * (section 861 and following) * * * and the regulations thereunder, a sale of personal property is

---

[4]Sec.861(a)(6) similarly defines "gross income from sources within the United States" to include all "gains, profits, and income derived from the purchase of personal property without the United States (other than within a possession of the United States) and its sale or exchange within the United States."

consummated at the time when, and the place where, the rights, title, and interest of the seller in the property are transferred to the buyer. Where bare legal title is retained by the seller, the sale shall be deemed to have occurred at the time and place of passage to the buyer of beneficial ownership and the risk of loss. * * *

In interpreting the above regulation, cases have focused on the place where title to the goods and risk of loss passes from the seller to the buyer. *Commissioner v Pfaudler Inter-American Corp.*, 330 F.2d 471, 474 (2d Cir. 1964), and cases cited at note 5 therein; *Commissioner v. Hammond Organ Western Export Corp.*, 327 F.2d 964, 966 (7th Cir. 1964). We therefore must determine whether title to goods sold by Purchasing and Aviation passed outside of the United States so that 95 percent of each petitioner's income for the years in issue was from non-U.S. sources, as required by the statute.

Petitioners contend that the evidence shows that title passed outside the United States. They claim (1) that they intended to pass title outside the United States; (2) that they bore the risk of loss until the goods reached their destination by way of a marine open cargo insurance policy; and (3) that the use of the terms "F.O.B." and "C.I.F." had no particular meaning to the sellers (petitioners) and purchasers of the goods involved. On the other hand, respondent contends that the use by the petitioners of the "F.O.B." and "C.I.F." shipping terms should be interpreted in accordance with their well-defined, commercially understood meanings. He asserts that petitioners have failed to show that there was any agreement between the parties evidencing an intent to give the shipping terms any special meaning. Further, respondent dismisses petitioners' contention with respect to the insurance policy. He first claims that, while the petitioners may have had an insurable interest in the goods during shipment, they did not bear the risk of loss. In the alternative, he claims that the insurance policies clearly excluded "F.O.B." and "C.I.F." shipments, thereby establishing that petitioners did not have even an insurable interest in the goods once they left Miami, the point of shipment.

In *A. P. Green Export Co. v. United States*, 151 Ct. Cl. 628, 284 F.2d 383, 387 (1960), the Court of Claims initially expressed its adherence to the title-passage test as the proper measure of the place of sale and source of income and then went on to determine the place where title to the goods passed. First, the

court looked at the express intention of the parties as embodied in their sales contracts. Finding a clear statement therein of intent to pass title at the point of delivery, the court found it unnecessary to go on to examine the shipping terms for evidence of a contrary intention. 284 F.2d at 388.

In the instant case, however, we have found that the invoices represented the only written evidence of transactions between the petitioner corporations and their customers. There were no written sales contracts or other explicit agreements between the sellers and buyers. We therefore must examine the sales invoices, the insurance policies, and other extrinsic evidence to ascertain the actual place where title to the goods passed from petitioners to their customers.

The sales invoices in issue were prepared in petitioners' offices to reflect verbal orders from customers. Each contained, among other terms, a box with the shipping term "F.O.B. ___ " imprinted therein. Office clerks would usually type "Miami, Fla." in the blank. On occasion, however, they typed in the terms "C.I.F. Panama" or "Panama" or "Santo Domingo"[5] or "Factory." Petitioners argue that they attached no special legal significance to the use of the term "F.O.B." The individual who served as president of both petitioning corporations testified that he knew that the term meant "free on board," that he understood the term to indicate only the price of the goods at the indicated location, and that he had never heard of the Uniform Commercial Code in all of the time that he had been in the exporting business. Petitioners have not put forth evidence of any understanding between themselves and their customers to show that they agreed to alter the common meanings of the shipping terms.

---

[5]With respect to the single invoice containing the term "F.O.B. Panama ," respondent has conceded that title to the airplane there-sold passed in Panama. Similarly, with respect to the invoices indicating "F.O.B. C.I.F. Panama " and "F.O.B. Santo Domingo ," we find that title to the goods indicated therein also passed outside the United States. Only petitioners would possess additional invoices showing F.O.B. a destination outside the United States. If such invoices existed, we assume petitioners would have produced them for trial. Failure to produce evidence which a party possesses and which, if true, would be favorable, gives rise to a presumption that if produced it would be unfavorable. *Wichita Terminal Elevator Co. v. Commissioner*, 6 T.C. 1158 (1946), affd. 162 F.2d 513 (10th Cir. 1947). Our determination with respect to these invoices does not affect the final outcome of the case.

The terms "F.O.B." and "C.I.F." have well-defined, commercially recognized meanings.[6] According to the Uniform Commercial Code, "F.O.B. the place of shipment" means that the seller must "bear the expense and risk of putting them [the goods] into the possession of the carrier." Similarly, "F.O.B. the place of destination" means that the seller must pay transportation costs and must bear the risk of loss until the goods are delivered to the indicated destination. Fla. Stat. Ann. sec. 672.2–319. The term "C.I.F." means that the quoted price includes the cost of the goods, insurance, and freight charges to the indicated destination. Fla. Stat. Ann. sec. 672.2–320. See also 10 S. Williston, Contracts, sec. 1080A (3d ed. 1967). The mere use of "F.O.B." and "C.I.F." terms, with nothing more, raises the presumption that title passes to the buyer on the seller's delivery of the goods to the indicated place. 4 S. Williston, Contracts, sec. 612 (3d ed. 1961). As we found above, the generally accepted meaning of these terms can be changed by express agreement of the parties, but no such clear agreement was set forth in this case. See *A. P. Green Export Co. v. United States, supra.* We therefore are obliged to follow the well-settled meaning of the terms. In fact, Florida courts take a similar view: where a contract for sale provides that goods be shipped "F.O.B. a specified point," title passes to the buyer at that point and risk of loss during the course of any further shipment is on the buyer. See Uniform Commercial Code, Fla. Stat. Ann. sec. 672.2–319, and comments thereto.

Furthermore, even if we accept petitioners' contention that "F.O.B." merely meant the price at the place indicated, it is clear that the term had a definite meaning to the parties. It was a term of sale. Usually, the invoices indicated that the goods were shipped "F.O.B. Miami." The fact that the term was altered on occasion to read "F.O.B. Panama," "F.O.B. Santo Domingo," or "F.O.B. C.I.F. Panama" is significant. It indicates that the clerk who filled in the invoices, or the supervisor who checked them, or

---

[6]According to the Uniform Commercial Code, as adopted by Florida, unless the parties have agreed that law of another jurisdiction is applicable, "this code applies to transactions bearing an appropriate relation to this state." Fla. Stat. Ann. sec. 671.1–105(1). In these cases, petitioners' offices were in Florida; goods were shipped from Florida or installed on customers' aircraft in Florida and invoices were prepared in Florida. We therefore find that the transactions in question had a sufficient relation with the State of Florida to require the application of the Uniform Commercial Code as enacted and interpreted by that jurisdiction.

the person who negotiated the order understood that the shipping terms had a commercially significant meaning. Furthermore, the fact that the term was altered belies any claim that neither petitioners nor their customers understood the commercial meaning of the shipping terms used.

Petitioners' president testified that the terms of each sale were bargained for and that the invoices reflected the results of those negotiations. As a term of sale, the shipping term was an important determinant of the costs to petitioners of doing business. We do not think it unfair or unreasonable to assume that those who ran successful corporations like Purchasing and Aviation understood or should have understood the commercial meanings of the terms they were using.

With respect to the insurance policies, we have found as a fact that the terms of the policies expressly excluded from the definition of "insurable interest" all goods sold by Purchasing or Aviation on an F.O.B., F.A.S., or C.I.F. basis. We have already found that use of the F.O.B. shipping term indicated the point at which the shipper's risk ended and the buyer's risk began. In most of petitioners' shipments this transfer of risk occurred in Miami. Petitioners claim that the insurance policies showed that they bore the risk of loss on the shipments until the goods reached their destinations. In our opinion, the terms of the insurance policies militate against petitioners' position by expressly excluding F.O.B. shipments. Where petitioners delivered the goods to the Miami airport, and then loaded or installed the goods on the buyer's aircraft (e.g., Panamanian Air Force aircraft, in the case of Aviation's sales to Panama) or on aircraft of a commercial shipper (e.g., LACSA Airlines, in the case of Purchasing's sales to Double A Leasing Corp.), they have satisfied their commercially understood obligations incurred by the use of the F.O.B. term. We therefore hold that, regardless of the existence of the insurance policies, petitioners no longer bore the risk of loss with respect to the shipments here in issue once delivery was satisfactorily made to the F.O.B. point. But see note 5 *supra*.

Finally, petitioners argue that they intended that title would pass outside the United States and that they acted in accordance with the spirit of the code sections dealing with Western Hemisphere trade corporations. We long have adhered to the principle that deductions are a matter of legislative grace. One

who seeks the benefit of a deduction must bring himself clearly within the terms of the authorizing statute or regulation. *New Colonial Ice Co. v. Helvering,* 292 U.S. 435, 440 (1934). See also *Interstate Transit Lines v. Commissioner,* 319 U.S. 590, 593 (1943). Section 922 authorizes a deduction where specific objective requirements are satisfied. One such requirement is that 95 percent of the corporation's gross income be foreign-source income. While we are sympathetic with petitioners' attempt to operate as Western Hemisphere trade corporations, we simply find that they have failed to arrange their affairs so as to come within the letter of the law.

Petitioners had total control over the form of their transactions. Strong proof must be put forth by petitioners for this Court to disregard the form in which they cast their transactions in an arm's-length deal. See, e.g., *Better Beverages, Inc. v. United States,* 619 F.2d 424, 430 (5th Cir. 1980); *Balthrope v. Commissioner,* 356 F.2d 28, 31–33 (5th Cir. 1966); *Major v. Commissioner,* 76 T.C. 239 (1981). This they have failed to do. When negotiating with customers over the terms of sales, petitioners could have insisted on a clear contractual statement of where title was to pass or could have arranged the terms to indicate clearly where the parties intended title to pass. For example, Purchasing claims that sales really were made to Costa Rica but were structured through Double A Leasing Corp. as a concession to Costa Rica. By agreeing to make the sales to a U.S. corporation and to deliver the goods to LACSA Airlines in Miami, Purchasing bargained away a valuable tax attribute; it gave up any right to consider the income as foreign-source income. If Purchasing had intended to retain title and risk of loss until the goods were out of the United States, it could have arranged its affairs accordingly. It failed to take the necessary steps to do so. The same holds true with respect to Aviation's sales to the Panamanian National Guard; the F.O.B. terms of the invoices and the fact that goods were loaded or installed on Panamanian aircraft or commercial carriers at Miami Airport together constitute substantial evidence that title in most transactions passed within the United States. Aviation has not put forth sufficient evidence to convince us otherwise.

We therefore look only to where title actually passed and not to the intent of the parties and conclude that petitioners have failed to show that at least 95 percent of their gross income for

the relevant periods was derived from non-U.S. sources. Both petitioner corporations fail to qualify as Western Hemisphere trade corporations because they fail to satisfy the requirement of section 921(1) that 95 percent of their respective gross incomes during the relevant periods be from non-U.S. sources.

*Decisions will be entered for the respondent.*