Jones, Chief Judge,
delivered the opinion of the court:
This case concerns § 109 of the Internal Revenue Code of 1939. The plaintiff, Electrical Export Corporation, is a Delaware corporation with its office and principal place of business located in New York City. The plaintiff says that for the year 1952 it qualified as a Western Hemisphere Trade Corporation under § 109. If the plaintiff qualifies under § 109, it is then entitled to the credit provided for by § 26 (i) (2) of the Internal Revenue Code of 1939.
Section 109(a) of the Code, 56 Stat. 798, 838, 26 U.S.C. § 109 (1952 Ed.) provides as follows:
Sec. 109. western hemisphere trade corporations.
For the purposes of this chapter the term “western hemisphere trade corporation” means a domestic corporation all of whose business is done in any country or countries in North, Central, or South America, or in the West Indies, or in Newfoundland and which satisfies the following conditions:
*325 (a) If 95 per centum or more of tbe gross income of such domestic corporation for the three-year period immediately preceding the close of the taxable year (or for such part of such period during which the corporation was in existence) was derived from sources other than sources within the United States; * * *
Section 26 of the Code, 53 Stat. 18, 26 U.S.C. § 26 (1952 Ed.) provides credits for corporations as follows:
In the case of a corporation the following credits shall be allowed to the extent provided in the various sections imposing tax—
'!• !¡J í¡< i];
(1) * * * In the case of a western hemisphere trade corporation (as defined in section 109) — [As added 64 Stat. 906,920, as amended 65 Stat. 452,470.]
* * * * *
(2) * * * In the case of a taxable year beginning after March 31,1951, and before April 1,1954, an amount equal to 27 per centum of its normal-tax net income computed without regard to the credit provided in this subsection.
The Commissioner of Internal Eevenue determined that the plaintiff did not qualify for the year 1952 as a Western Hemisphere Trade Corporation under § 109 and was therefore not entitled to the credit provided for by § 26 (i) (2). On August 12, 1957, the plaintiff filed timely claim for refund for the year 1952 with the District Director. On October 16,1958, this claim was disallowed. On December 12, 1958, plaintiff filed suit in this court for the refund of $31,943.48 of its 1952 income taxes, together with applicable deficiency interest paid thereto, together with statutory interest on both amounts as provided by law.
The resolution of this lawsuit is dependent on determining the nature of certain interest income received by plaintiff in the 3-year period 1950 through 1952. The interest at issue arises out of four contracts between the plaintiff and Latin-American purchasers who were supplied by the plaintiff with electric locomotives and related equipment. Three of these purchasers were located in Brazil and one in Chile. In payment of goods purchased, the Brazilian buyers issued a series of notes to plaintiff’s order calling for semiannual *326 payments of level amounts of principal and interest. The notes of the Chilean purchaser provided for payment of semiannual principal amounts with interest at 4 percent per annum.
These contracts were financed under an agreement between the plaintiff and the Export-Import Bank of Washington whereby the bank agreed to finance a part of each transaction up to 70 percent of the value of the equipment sold. Under this agreement, the bank required that if the local interest payments in each note when paid were not sufficient to cover the bank’s interest calculated on the outstanding principal balances, then plaintiff would pay to the bank the difference. When the level interest payments by the foreign purchasers exceeded the bank’s requirements, the excess interest was paid by the bank to the plaintiff.
It is our task to identify the sources of this interest income received by plaintiff. If it was from sources in Brazil and Chile, clearly the plaintiff qualifies as a Western Hemisphere trade corporation. If the source of this interest originates in the United States, then of course the plaintiff does not qualify because, under § 109, 95 percent of the corporation’s gross income must have been derived from sources outside the United States.
The trial commissioner has found that more than 95 percent of plaintiff’s gross income from the 3-year period ended December 31, 1952, was derived from sources in Brazil and Chile.[1] The defendant takes exception to this finding. The defendant contends that the payments in question were not made pursuant to the promissory notes but that they were made under a separate and distinct agreement between the bank and the taxpayer. Defendant says that the payments to the taxpayer came not from the foreign purchasers in Brazil and Chile but from a source within the United States, the Export-Import Bank of Washington. Furthermore, the defendant declares that the payments did not involve the foreign purchasers but arose out of a financing arrangement entered into and performed solely within the *327 United States. Accordingly, the defendant concludes that the interest at issue in this case had its source within the United States.
We think the defendant cannot see the forest for the trees. The method of payment of this interest reveals the true nature of this arrangement. When the bank received excess interest from the foreign purchasers, the excess interest was placed in a trustee account from which the bank distributed it to the plaintiff. Indeed, the trial commissioner has found that such excess interest was collected by the bank on behalf of the plaintiff.[2]
We believe that the acceptance of defendant’s position here would frustrate that commerce between American businessmen and their Latin-American counterparts which it was the purpose of § 109 to encourage. In A. P. Green Export Company v. United States, 151 Ct. Cl. 628, this court expressed its view on the legislative intent of § 109. We said at p. 633:
The announced legislative purpose of section 109 was to encourage domestic corporations to engage in foreign commerce. European countries had granted tax concessions to their nationals engaged in Western Hemisphere trade. The Congress was thus moved to grant similar tax credits to our domestic corporations thereby permitting them to compete on equal footing. Without such tax assistance Western Hemisphere trade would in many instances not be profitable enough to pursue.
It would run counter to this construction of § 109 to permit the financing aspect of these contracts to obscure the true source of this interest income, i.e., interest payments by foreign purchasers, situated in Brazil and Chile, to an American seller. The mere fact that these payments were distributed by the Export-Import Bank of Washington cannot shift their source from Latin America to Washington. Viewing the entire transaction involved in the instant case as a whole, we conclude that the plaintiff qualifies as a § 109 corporation for the year 1952 and is entitled to a credit under § 26 (i) (2). Therefore the plaintiff is entitled to recover and judgment *328 will be entered to that effect, with the amount of recovery to be determined in further proceedings pursuant to Eule 38 (c).
It is so ordered.
Dureee, Judge; Laramore, Judge; Madden, Judge; and Whitaker, Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Eoald A. Hogenson, and the briefs and argument of counsel, makes findings of fact as follows:
1. The petition in this case was filed pursuant to the provisions of section 1491, Title 28 of the United States Code for the recovery of income taxes for the calendar year 1952.
2. Plaintiff is a Delaware corporation with its office and principal place of business located at 150 East 42nd Street, New York, New York. During the period herein involved until July 31, 1952, one-half of plaintiff’s voting stock was owned by International General Electric Company, Inc., and thereafter by General Electric Company. The other half of plaintiff’s voting stock was owned by Westinghouse Electric International Company.
On December 27, 1939, plaintiff was registered with the Federal Trade Commission as a “Webb-Pomerene Act Corporation” pursuant to the provisions, of Title 15, U.S.C. §§ 61-65. At all times material herein, plaintiff was engaged primarily in the business of selling and financing the sale of equipment for the electrification of railroads in South America. This equipment was manufactured by General Electric Company and Westinghouse Electric Company. They sold it to plaintiff which in turn sold it to the foreign customers.
On September 6, 1940, plaintiff was authorized by the Government of Brazil to do business in Brazil as a foreign corporation. During the period herein involved plaintiff maintained an office at Sao Paulo, Brazil, staffed by its own employees. During the taxable year plaintiff had no employees in the United States. Some services were performed for plaintiff in the United States by employees of and in the offices of International General Electric Company, Inc., or General Electric Company, and Westinghouse Electric Com *329 pany, which expenses were charged, to plaintiff. Plaintiff’s books of account were maintained and its tax returns filed on the accrual basis and on the basis of a taxable year ending on December 31.
3. Plaintiff’s income tax return for the calendar year 1952 was filed with the District Director, Upper Manhattan District, New York, New York (hereinafter referred to as the “District Director”) and disclosed an income tax liability of $80,865.70 which was paid. Thereafter, on April 8, 1957, the Commissioner of Internal Revenue (hereinafter referred to as the “Commissioner”) determined a deficiency in tax in the amount of $31,943.48, which deficiency was paid by plaintiff on or about July 2,1957, together with deficiency interest thereon.
4. In determining the deficiency referred to in finding No. 3, the Commissioner determined that plaintiff for the year 1952 did not qualify as a Western Hemisphere Trade Corporation under section 109 of the Internal Revenue Code of 1939 (hereinafter referred to as the “1939 Code”) and was therefore not entitled to the credit provided for by section 26 (i) (2) of the 1939 Code. For the years 1950 and 1951, plaintiff claimed on its tax returns and was allowed the credit granted to Western Hemisphere Trade Corporation.
5. On October 12, 1940, the State of Sao Paulo, Brazil, entered into a contract with plaintiff and Companhia de Mineracao e Metalurgia Brasil — “Cobrasil” providing, among other things, for the supplying by plaintiff of electric locomotives and related equipment necessary for the electrification of the section of the Sorocabana Railway between Sao Paulo and Santo Antonio, Brazil. The total contract price for the equipment to be supplied by plaintiff was $6,388,295.00, exclusive of interest. This contract is hereinafter referred to as “Contract EEC-1.” The Soro-cabana Railway was an agency of the State of Sao Paulo, Brazil.
6. On December' 29,1944, the Estrada de Ferro Central do Brasil (hereinafter called “Central Railway”) entered into a contract with plaintiff providing, among other things, for the supplying by plaintiff of electric locomotives and related equipment necessary for the electrification of a section of *330 tbe railway line of the Central Eailway. The total contract price for the equipment to be supplied by plaintiff was $6,029,535.00, exclusive of interest. This contract is hereinafter referred to as “Contract EEC-2.” The Central Eailway was a federal Brazilian railway operating in Brazil.
7. On May 24,1945, the Sorocabana Eailway entered into a contract with plaintiff providing, among other things, for the supplying by plaintiff of electric locomotives and related equipment necessary for the electrification of the section of the Sorocabana Eailway between Santo Antonio and Bern-ardino de Campos, Brazil. The total contract price for the equipment to be supplied by plaintiff was $9,498,601.84, exclusive of interest. This contract is hereinafter referred to as “Contract EEC-8.”
8. On September 6,1946, La Empresa de los Ferrocarriles del Estado de Chile (hereinafter called “Chilean State Eail-ways”) entered into a contract with plaintiff providing, among other things, for the supplying by plaintiff of electric locomotives and related equipment for use by the Chilean State Eailways. The total contract price for the equipment to be supplied by plaintiff was $3,988,418.06, exclusive of interest. This contract is hereinafter referred to as “Contract EEC-4.” The Chilean State Eailways was an agent of the Chilean government operating in Chile.
9. Before entering into Contracts EEC-1, EEC-2, EEC-3 and EEC-4, plaintiff negotiated with the Export-Import Bank of Washington (hereinafter called the “Bank”) in order that the latter would agree to finance a part of the transaction under each contract up to 70 percent of the value of the equipment to be supplied. The Bank is a government agency established by Congress for the purpose of financing the export of goods. The sources of its income are from interest earned on foreign obligations purchased in financing export shipments.
10. Under Contract EEC-1 the Sorocabana Eailway issued the following promissory notes to the order of plaintiff as payee:
(a) Twenty (20) series “A” notes dated March 17, 1941, due semiannually from March 31, 1943 to September 30, 1952, each providing for the payment of $276,413.54. Of this *331 sum, $223,590.33 represented principal payments and $52,-823.21 interest. Interest payable by Sorocabana Railway was computed at the rate of 4.50 percent per annum beginning October 1,1942.
(b) Twenty (20) series “B” notes dated March 17, 1941, due semiannually from March 31,1943 to September 30,1952, each providing for the payment of $118,462.95. Of this sum, $95,824.42 represented principal payments and $22,638.53 interest. Interest payable by Sorocabana Railway was computed at the rate of 4.50 percent per annum beginning October 1,1942.
The total interest to be paid by the Sorocabana Railway had been calculated over the life of the notes divided by the number of notes so that each note in each series included a pro rata or level amount of principal and interest. Each note in each series was initially placed in escrow with a New York bank. The first six of the series “A” and “B” notes were released from escrow to plaintiff on April 10, 1941 as an initial payment on the contract. The remainder of the notes were released from escrow to plaintiff against shipments of material. Title to the materials shipped by plaintiff passed in Brazil to the Sorocabana Railway. Plaintiff supervised the installation of the equipment in Brazil.
11. Under date of December 2,1940, plaintiff and the Bank entered into a letter agreement under which the Bank agreed to purchase from plaintiff without recourse as to principal the 20 series “A” notes of the Sorocabana Railway at their principal amount less a 5 percent discount. In this agreement plaintiff and the Bank agreed in part as follows:
When presenting each Series A note to you [the Bank] for purchase we [plaintiff] will give you an undertaking, in writing * * * that upon payment of each of such Series A notes purchased by you, we will pay you an amount necessary to enable you to recover 4.50 percent interest to the maturity date thereof on the outstanding principal balance of [a] 11 Series A notes then held by you, * * *.
Likewise, you [the Bank] agree to pay us any amount when collected by you on any of said notes at maturity which may exceed your interest and principal requirements at such maturity, * * *.
*332 Pursuant to this agreement of December 2,1940, from April 10, 1941 to January 23, 1947 within the time as extended by the Bank, the Bank acquired without recourse as to principal the 20 “A” notes from plaintiff for a net amount of $212,410.81 for each note consisting of $223,590.33, the amount of each note representing principal, less a 5 percent commission to the Bank of $11,179.52. None of the series “A” notes was sold by plaintiff to the Bank prior to its release from escrow. The Bank computed its interest requirements on each of the series “A” notes purchased from plaintiff only from the date of purchase thereof. To the extent that interest had accrued on any of the series “A” notes prior to their sale by plaintiff, such interest belonged to plaintiff.
12. The following schedule sets forth the date the Bank acquired each of the series “A” notes under Contract EEC-1, the year the note was paid, the amount of the Bank’s interest requirements calculated under its letter agreement with plaintiff, the interest paid by the Sorocabana Railway included in each note, the amounts paid by plaintiff to the Bank, and the amounts paid to plaintiff by the Bank during the years 1943 through 1952:

All payments by the Bank to plaintiff in 1943 and in the years 1948 through 1952 were made from the excess of the *333 interest payments paid by the Sorocabana Railway in its series “A” notes over the Bank’s interest requirements.
13. Under Contract EEC-2 the Central Railway issued the following promissory notes to the order of plaintiff as payee:
(a) Twenty (20) series “A” notes dated March 15, 1945, due semiannually from October 24, 1946 to April 24, 1956, each providing for the payment of $256,142.20. Of this sum, $211,033.73 represented principal payments and $45,108.47 interest. Interest payable by Central Railway was computed at the rate of 4.50 percent per annum beginning October 25, 1946.
(b) Twenty (20) series “B” notes dated March 15, 1945, due semiannually from October 24, 1946 to April 24, 1956, each providing for the payment of $109,775.20. Of this sum $90,443.02 represented principal payments and $19,332.18 interest. Interest payable by Central Railway was computed at the rate of 4.50 percent per annum beginning October 25, 1946.
The total interest to be paid by the Central Railway had been calculated over the life of the notes divided by the number of notes so that each note in each series included a. pro rata or level amount of principal and interest. Each note in each series was initially placed in escrow with a New York bank and was released from escrow to plaintiff against shipments of material. Title to the materials shipped by plaintiff passed to the Central Railway in Brazil. Plaintiff supervised the installation of the equipment in Brazil.
14. Under date of March 31, 1945, plaintiff and the Bank entered into a letter agreement under which the Bank agreed to purchase from plaintiff without recourse as to principal the 20 series “A” notes of the Central Railway at their principal amount less a 5 percent discount. In this agreement plaintiff and the Bank agreed in part as follows:
2. Interest and commission. The Bank shall receive interest at the rate of four per cent (4%) per annum on the outstanding principal balance or the obligations or participation therein discounted or purchased hereunder. In the event the obligations bear or have included therein interest at a rate in excess of four per cent (4%) per annum the Bank shall receive interest on the foregoing-basis at the higher rate.
As each obligation purchased by the Bank is paid an adjustment will be effected between the Bank and the *334 Supplier as may be required to provide for the receipt by the Bank of interest at the rate aforesaid on the outstanding principal balance of all obligations then held by the Bank. Accordingly, in the event the amount collected by the Bank upon any maturity date is not sufficient to satisfy payment to the Bank of principal and interest to the date of payment on the outstanding principal balance of all obligations then held by the Bank, the Supplier will pay to the Bank such additional amount as may be required aforesaid; and, in the event an excess amount should be collected by the Bank upon payment of any obligation, the Bank will remit such excess to the Supplier. It is further understood that interest due to the Bank on the principal contained in any note purchased by it will be computed only from the date of such purchase.
In the event the Bank shall, at the request of the Supplier, discount or purchase any obligation or participation therein prior to the date from which interest is included in such obligation the Supplier shall be liable to the Bank, and shall pay at least semi-annually, interest at the rate aforesaid from the date of such discount or purchase to the date from which interest is included in such obligation.
Pursuant to said agreement, from February 7,1947, to March 11,1950, the Bank acquired without recourse as to principal 18 of the twenty “A” notes from plaintiff for a net amount of $200,482.04 for each note consisting of $211,033.73, the amount of each note representing principal, less a 5 percent discount by the Bank of $10,551.69. None of the series “A” notes was sold by plaintiff to the Bank prior to its release from escrow. The Bank computed its interest requirements on each of the 18 series “A” notes purchased only from the date of purchase thereof. To the extent that interest had accrued on any of the series “A” notes prior to their sale by plaintiff, such interest belonged to plaintiff. At the time the first two of the series “A” notes were released from escrow, payment thereon was already due. Plaintiff did not sell these notes to the Bank but collected the principal and interest thereon directly from the Central Railway.
15. The following schedule sets forth the date the Bank acquired 18 out of the 20 series “A” notes under Contract EEC-2, the year the note was paid, the amount of the Bank’s interest requirements calculated under its letter agreement *335 with, plaintiff, the interest paid by Central Railway included in each, note, tlie amounts paid by plaintiff to the Bank and the amounts paid to plaintiff by the Bank, or by the Central Railway on the two series “A” notes not acquired by the Bank, during the years 1946 through 1956:

All of the payments by the Bank to plaintiff in 1947 and in the years 1952 through 1956 were made from the excess of the interest payments paid by the Central Railway in its series “A” notes over the Bank’s interest requirements.
16. Under Contract EEC-3, the Sorocabana Railway issued the following promissory notes to the order of plaintiff as Payee:
(a) Fourteen (14) series “A” notes dated May 24, 1945, due semiannually from December 1, 1947 to June 1, 1954, each providing for the payment of $558,932.16. Of this sum, $474,930.09 represented principal payments and $84,-002.07 interest. Interest payable by Sorocabana Railway was computed at the rate of 4.50 percent per annum beginning Junel, 1947.
(b) Fourteen (14) series “B” notes dated May 24, 1945, due semiannually from December 1,1947 to June 1,1954, each providing for the payment of $239,542.36. Of this sum, $203,541.47 represented principal payments and $36,000.89 *336 interest. Interest payable by Sorocabana Railway was computed at the rate of 4.50 percent per annum beginning June 1, 1947.
The total interest to be paid by the Sorocabana Railway had been calculated over the life of the notes divided by the number of notes so that each note in each series included a pro rata or level amount of principal and interest. Each note in each series was initially placed in escrow with a New York bank and was released from escrow to plaintiff against shipments of material. Title to the materials shipped by plaintiff passed to the Sorocabana Railway in Brazil. Plaintiff supervised the installation of the equipment in Brazil.
17. Under date of July 11, 1947, plaintiff and the Bank entered into a letter agreement under which the Bank agreed to purchase from plaintiff without recourse the 14 series “A” notes of the Sorocabana Railway at their principal amount without discount. In this agreement plaintiff and the Bank agreed in part as follows:
Interest. The Bank shall receive interest at least semiannually at the rate of not less than four and one-half per cent (4%%) per annum on the outstanding principal balance of the obligations discounted or purchased hereunder. Such interest shall be computed to and payable at the time of the maturity of each installment of principal. In the event that the amount collected on the maturity of any obligation purchased hereunder is insufficient to pay the installment of principal and such computed interest on the total outstanding principal balance of the obligations purchased by the Bank, the Supplier will, on notice from the Bank, pay to the Bank the amount of such deficiency of interest. In the event the amount collected on the maturity of any obligation exceeds the amount necessary to pay the installment of principal and such computed interest, the Bank will remit the amount of such excess interest to the Supplier.
Pursuant to this agreement of July 11,1947, from November 14,1947 to December 28,1950, within the time as extended by the Bank, the Bank acquired without recourse as to principal the 14 “A” notes from plaintiff for a net amount of $474,980.09 for each note consisting of $474,930.09, the amount of each note representing principal without discount. None *337 of the series “A” notes was sold by plaintiff to the Bank prior to its release from escrow. The Bank computed its interest requirements on each of the 14 series “A” notes purchased only from the date of purchase thereof. To the extent that interest had accrued on any of the series “A” notes prior to their sale by plaintiff, such interest belonged to plaintiff.
18. The following schedule sets forth the date the Bank acquired the 14 series “A” notes under Contract EEC-3, the year the note was paid, the amount of the Bank’s interest requirements calculated under its letter agreement with plaintiff, the interest paid by Sorocabana Railway included in each note, the amounts paid by plaintiff to the Bank and the amounts paid to plaintiff by the Bank during the years 1947 through 1954:

All of the payments by the Bank to plaintiff in the years 1947,1948 and 1950 through 1954 were made from the excess of the interest payments paid by the Sorocabana Railway in its series “A” notes over the Bank’s interest requirements.
19. Under Contract EEC-4 the Chilean State Railways issued six series of promissory notes to the order of plaintiff as Payee as follows:
(a) Fourteen (14) series “A” notes dated September 6, 1946, due semiannually from September 6, 1948 to March 6, 1955, each providing for the payment of $164,420.90 principal with interest payable semiannually in March and September calculated from March 6, 1948 at 4 percent per annum.
*338 (b) Fourteen (14) series “B” notes dated September 6, 1946, due semiannually from September 6, 1948 to March. 6, 1955, each providing for the payment of $70,466.10 principal with interest payable semiannually in March and September calculated from March 6,1948 at 4 percent per annum.
(c) Eight (8) series “C” notes dated September 6, 1946, due semiannually from September 6, 1948 to March 6, 1955, each providing for the payment of $17,500 principal with interest payable semiannually in March and September calculated from March 6,1948 at 4 percent per annum.
(d) Eight (8) series “D” notes dated September 6, 1946, due semiannually from September 6, 1948 to March 6, 1955, each providing for the payment of $7,500 principal with interest payable semiannually in March and September calculated from March 6,1948 at 4 percent per annum.
(e) Fourteen (14) series “E” notes dated September 6, 1946, due semiannually from March 6,1951 to March 6,1955, each providing for the payment of $25,000 principal with interest payable semiannually in March and September calculated from March 6,1949 at 4 percent per annum.
(f) Fourteen (14) series “F” notes dated September 6,1946, due semiannually from March 6,1951 to March 6,1955, each providing for the payment of $10,714.29 principal with interest payable semiannually in March and September calculated from March 6,1949 at 4 percent per annum.
In none of the foregoing series of notes, referred to in subparagraphs (a) through (f), was interest included in the face amount of the notes. Each note in each series was initially placed in escrow with a New York bank and was released from escrow to plaintiff against shipments of material. The equipment was installed in Chile by the Chilean State Kailways.
20. Under date of February 21, 1946, plaintiff and the Bank entered into a letter agreement under which the Bank agreed to purchase without recourse as to principal notes of the Chilean State Railways in an aggregate amount up to 70 percent of the contract price. Pursuant to this agreement, the Bank acquired from September 16, 1948 to December 15, 1950, at face, the 14 series “A” notes, and the 8 series “C” notes and 9 of the 14 series “E” notes from plaintiff. None *339 of the notes was sold by plaintiff prior to its release from escrow.
21. Under its letter agreement with the Bank plaintiff made no payments to the Bank with respect to Contract EEC-4. In 1950 and 1951 plaintiff received from the Bank the amounts of $10,904.74 and $2,465.75, respectively, representing accrued interest on series “A”, “C” and “E” notes from the last previous interest date to the dates of acquisition by the Bank, which interest was collected by the Bank on behalf of plaintiff from the Chilean State Railways on the next semiannual interest date and paid to plaintiff.
22. On all notes purchased by the Bank from plaintiff under Contracts EEC-1, EEC-2 and EEC-3, the Bank on effecting collection thereof would first apply the principal and interest to its requirements. If the interest paid by the foreign obligor was insufficient to meet the Bank’s interest requirements it would notify plaintiff in writing of the amount of the deficiency. Plaintiff thereupon would pay to the Bank such deficiency. If the interest paid by the foreign obligor was in excess of the Bank’s interest requirements, the Bank after first satisfying its requirements would place the excess interest in a trustee account from which it would be disbursed to plaintiff. In such cases the excess interest was collected by the Bank on behalf of plaintiff. The amounts placed in this trustee account did not become a part of the Bank’s income. No payments to plaintiff by the Bank were made prior to the collection by the Bank of the amounts due from the foreign obligors. During the period herein involved the Bank had no dealings with plaintiff other than its agreements relating to Contracts EEC-1, EEC-2, EEC-3 and EEC-4 and owed plaintiff no money on which it was paying interest.
23. Under Contracts EEC-2 and EEC-3 plaintiff was required to post performance bonds. For that purpose plaintiff acquired Brazilian war bonds. In the years 1950, 1951 and 1952 plaintiff received interest on these bonds in the total amounts of $523.44, $6,520.38 and $1,818.41, respectively.
24. During the years 1950,1951 and 1952, plaintiff’s gross profit on sales and interest income segregated by Contracts EEC-1, EEC-2, EEC-3 and EEC-4 was as follows:

*340

Plaintiff’s gross income for the calendar years 1950, 1951, and 1952, is summarized as follows:

25. Under Contracts EEC-1, -2 and -B, plaintiff booked as income in their entirety the interest payments made by the obligors on both series of notes, and booked annually as accrued interest expense in their entirety the interest pay *341 ments due to the Bant under its letter agreements with, plaintiff on the notes held by the Bank. On its tax returns for the years herein involved, plaintiff eliminated from book interest income and from book interest expense the interest retained by the Bank from the payments of said obligors’ series “A” notes and reported the net balances as interest income and interest expense.
26. Under Contract EEC-4 plaintiff booked as interest income only the interest received by it from the Chilean State Railways upon its notes held by plaintiff and the amounts received from the Bank representing interest accrued to plaintiff to the dates the series “A”, “C” and “E” notes were acquired by the Bank and which interest was collected by the Bank on behalf of plaintiff. On its tax returns plaintiff reported these items as interest income.
27. Plaintiff had no other contracts with purchasers during the years 1950 through 1952.
28. At all times material herein all of plaintiff’s business was done in countries in North, Central and South America and 90 percent of its gross income for the three-year period immediately preceding the close of the taxable year 1952 was derived from the active conduct of a trade or business.
29. The amount of the credit against income provided for by section 26,(i) (2) of the 1939 Code, the allowance of which is an issue in this proceeding, is $61,429.77.
30. On or about August 12, 1957, plaintiff filed with the District Director its claim for refund for the year 1952 covering the issue raised in its petition. On October 16, 1958, this claim was disallowed in accordance with the provisions of section 3772(a) (2) of the 1939 Code.
31. More than 95 percent of plaintiff’s gross income for the three-year period ended December 31,1952, was derived from sources other than sources within the United States, that is, from sources in Brazil and Chile.
CONCLUSION OK LAW
Upon the foregoing findings of fact which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover, and judgment will *342 be entered to that effect. The amount off recovery will be determined pursuant to Hule 38 (c).
In accordance with the opinion of the court and on a memorandum report of the commissioner as to the amount due thereunder, it was ordered on September 8, 1961, that judgment for plaintiff be entered for $40,316.85, together with interest thereon as provided by law.

 Finding 31.

 Finding 23.