PAN AMERICAN EUTECTIC WELDING ALLOYS CO., INC., PETITIONER, *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 72544, 74765.   Filed May 17, 1961.

*Morton L. Deitch, Esq.*, and *Lewis G. Cole, Esq.*, for the petitioner.
*Charles M. Greenspan, Esq.*, and *Warren S. Shine, Esq.*, for the
respondent.

ATKINS, *Judge:* The respondent determined deficiencies in income
and excess profits taxes for the years and in the amounts as follows:

| Docket No. | Taxable year ended Oct. 31— | Income tax | Excess profits tax |
|---|---|---|---|
| 72544 | 1952 | $12, 301. 60 | $14, 213. 94 |
| 72544 | 1953 | 1, 591. 99 | None |
| 72544 | 1954 | 4, 907. 43 | 407. 16 |
| 74765 | {1955 | 6, 507. 87 | |
|  | {1956 | 21, 251. 56 | |

The only issue is whether the petitioner qualifies as a Western
Hemisphere trade corporation within the meaning of section 109 of
the Internal Revenue Code of 1939 and section 921 of the Internal
Revenue Code of 1954 and is therefore entitled to the credit provided
by section 26 (i) of the 1939 Code and the special deduction provided
by section 922 of the 1954 Code.

The respondent by stipulation concedes that there are no deficiencies
in excess profits tax for the taxable years ended October 31, 1952, and
October 31, 1954.

FINDINGS OF FACT.

Some of the facts are stipulated and are incorporated herein by
this reference.

The petitioner is a corporation organized on April 30, 1947, under
the laws of the State of New York, with its principal place of business
in the city of New York.   It is engaged in the business of buying and
selling welding rods and related materials.   It keeps its books and
prepares its income tax returns on the basis of a fiscal year ending

October 31, and employs an accrual method of accounting. Its Federal income tax returns for the taxable years ended October 31, 1952, through October 31, 1956, were filed with the director of internal revenue for the second New York district.

The petitioner is, and during each of the years in controversy was, a wholly owned subsidiary of Eutectic Welding Alloys Corp., hereinafter referred to as EWAC, a corporation organized on January 15, 1946, under the laws of the State of New York. During the fiscal year ended October 31, 1952, the capitalization of the parent was represented entirely by common stock which was owned 55 percent by Rene D. Wasserman and 45 percent by his then wife, Marie Rose Wasserman. On November 1, 1952, the parent was recapitalized and thereafter the entire amount of common stock was owned by Wasserman and the preferred stock was owned by trustees of a trust created by his then wife, the trustees being Sigmund Wasserman and Jose Hassid. Rene D. Wasserman was and is president of both the petitioner and EWAC.

Rene Wasserman emigrated to the United States from Switzerland in 1940 and organized a business for the purpose of manufacturing specialty welding rods, which are materials used for the purpose of welding breaks and cracks in metal. This organization and its successor, Alpine Metals Manufacturing Co., were sole proprietorships. The sole proprietorship was discontinued in October 1955, when its functions were assumed by EWAC.

The petitioner was formed on the advice of counsel for the purpose of selling the specialty welding products manufactured by Alpine Metals Manufacturing Co., for ultimate consumption in Canada, Central America, and South America. During each of the years in controversy all of petitioner's business was done in North, Central, and South America and in the West Indies. It purchased the products from Alpine Metals Manufacturing Co. until that individual proprietorship discontinued business and thereafter from EWAC.

EWAC also set up a corporation called Low Temperature Welding Alloys Corp. for the purpose of selling these products for consumption in countries outside the Western Hemisphere, and a corporation called American Eutectic Welding Sales Co. to sell such products for consumption in the United States.

The petitioner, EWAC, and Alpine Metals Manufacturing Co. were all located at 40–40 172d Street, Flushing, New York, which property consisted of sizable factory and office buildings. Overhead service charges, such as bookkeeping and office rent, telephone and postage expense, and insurance on goods in transit, were paid by EWAC and allocated to the petitioner, to the sole proprietorship, and to EWAC's other wholly owned subsidiaries. Other expenses were paid directly by petitioner. The products purchased by the petitioner

and the other subsidiaries from EWAC and from Alpine Metals Manufacturing Co. were sold to them at 7 percent above cost.

The petitioner made the following sales during the taxable years involved:

| | Gross sales | Returns and allowances per books | Net sales |
|---|---|---|---|
| **Fiscal year ended Oct. 31, 1952** | | | |
| Canadian—regular | $4,559.89 | $459.98 | $4,099.91 |
| Canadian—distributors | 112,674.38 | 3,213.17 | 109,461.21 |
| Export | 24,258.61 | 866.26 | 23,392.35 |
| E.I.S.A. (M.I.S.A.) | 166,583.68 | | 166,583.68 |
| Equipment | | | |
| Total | 308,076.56 | 4,539.41 | 303,537.15 |
| **Fiscal year ended Oct. 31, 1953** | | | |
| Canadian—regular | 57,339.68 | 4,194.69 | 53,144.99 |
| Canadian—distributors | 115,582.16 | 32,000.23 | 83,581.93 |
| E.I.S.A. (M.I.S.A.) | 80,711.85 | | 80,711.85 |
| Equipment | 223.07 | | 223.07 |
| Export | 23,114.74 | 560.30 | 22,554.44 |
| Total | 276,971.50 | 36,755.22 | 240,216.28 |
| **Fiscal year ended Oct. 31, 1954** | | | |
| Canadian—regular | 5,485.23 | 2,808.64 | 2,676.59 |
| Canadian—distributors | 70,198.26 | 988.00 | 69,210.26 |
| Eutectic Welding Alloys Co. of Canada Ltd | 21,561.71 | | 21,561.71 |
| Export | 38,906.43 | 12,997.53 | 25,908.90 |
| E.I.S.A. (M.I.S.A.) | 160,531.18 | | 160,531.18 |
| Equipment | (8.28) | | (8.28) |
| Total | 296,674.53 | 16,794.17 | 279,880.36 |
| **Fiscal year ended Oct. 31, 1955** | | | |
| M.I.S.A | 123,297.67 | | 123,297.67 |
| Export | 27,313.04 | 2.44 | 27,310.60 |
| Canadian—distributors | 103,087.76 | 4,697.08 | 98,390.68 |
| Canadian—regular | 877.55 | 199.91 | 677.64 |
| Total | 254,576.02 | 4,899.43 | 249,676.59 |
| **Fiscal year ended Oct. 31, 1956** | | | |
| M.I.S.A | 138,338.48 | | 138,338.48 |
| Export | 35,771.74 | 186.41 | 35,585.33 |
| Canadian Weldrods Mfg. Co., Ltd | 249,019.37 | | 249,019.37 |
| Canadian—distributors | 73,506.08 | 17,585.64 | 55,920.44 |
| Canadian—regular | 48.70 | | 48.70 |
| Total | 496,684.37 | 17,772.05 | 478,912.32 |

Eutectic International S.A. (E.I.S.A.), was a corporation organized under the laws of the Republic of Panama in 1947. It was dissolved on June 1, 1953, and a corporation known as Metallica International S.A. (M.I.S.A.), a corporation also organized under the laws of the Republic of Panama in 1953 by the same interests, continued the same activities in the same manner. These two corporations are sometimes hereinafter referred to collectively as MISA. MISA was owned

22 percent by Rene Wasserman's father and 78 percent by other Swiss interests.

EWAC and the petitioner entered into contracts with MISA and its predecessor authorizing and licensing those two corporations to purchase the products in question and to sell them anywhere in the world other than in the United States, the Dominion of Canada, British Columbia, Newfoundland, the Hawaiian Islands, the Canal Zone, and the Republic of Panama, for use outside of those countries. Therein it was agreed:

that the title to all merchandise sold shall remain in EUTECTIC and/or PAN-AMERICAN EUTECTIC, whichever is the seller, until delivery at destination; and by the same token risk of loss until arrival at destination shall remain in the seller.

In a typical transaction between the petitioner and MISA, an order was first placed with MISA by one of its customers for certain specified products to be shipped to a port outside the United States, and requesting as terms of payment a 60-day sight draft on a bank in a Central American country.

MISA by letter then confirmed the order and the terms, enclosing its invoice showing a "Value F.A.S. [free alongside ship] New York," and stating that the goods were to be sent by maritime freight and that insurance was covered "by our New York plant for your account." Copies of this letter and of the production invoice, together with shipping instructions and instructions as to handling of documents, were sent by MISA to petitioner. The instructions typewritten on the letter were in part as follows:

*NEW YORK:*
We enclose 6 copies of our production invoice. Please put goods immediately into production and apply for U.S. E/L. Once the goods have become ready, please effect shipment by ocean freight. Haras are to draw documentary draft at 60 days' sight through the Banco Hipotecario de El Salvador, San Salvador. Insurance is to be covered under your open policy for account of customers. * * *

The petitioner then filled the order in New York and turned the goods over to a freight forwarder, Haras & Company, international shipping specialists, and gave the freight forwarder the instructions as to shipping which petitioner had received from MISA. The freight forwarder was instructed to make the bill of lading in the name of petitioner. Petitioner also delivered a commercial invoice and insurance certificate, showing the petitioner as the insured, and requesting that the freight forwarder draw the sight draft. Petitioner also advised the freight forwarder to inform the bank that it was to follow MISA's instructions regarding collection and further handling of the goods.

The freight forwarder then prepared shipping documents. These were sent under a covering letter to the bank in the country of desti-

nation. Accompanying this letter were petitioner's draft, the bill of lading, insurance certificate, and commercial invoice to MISA's customer. The bill of lading was prepared by the freight forwarder to the order of petitioner. The freight forwarder had the power to, and did, endorse the bill of lading before forwarding it to the bank.

At the same time that it prepared the invoice to MISA's customer, the petitioner invoiced MISA for the goods, stating that "charges follow."

The petitioner later forwarded to MISA the freight forwarder's statement of charges and debited MISA's account accordingly.

MISA later sent its formal purchase order to petitioner.

The documents held by the bank were delivered to MISA's customer when the latter accepted the draft, and the bank in due course made collection of the draft, remitting the proceeds to MISA, and so advised the freight forwarder.

Petitioner billed MISA on open account and MISA made payments in dollars in New York to petitioner, usually 30 days after arrival of the goods in the country of destination.

The petitioner recorded sales in its books when it received the dock receipt from the freight forwarder showing that the goods had been delivered in New York to the carrier.

Petitioner's books never showed any goods in transit as inventory or otherwise.

All shipments to or for petitioner's customers were insured by petitioner under an open policy for at least the price paid by MISA's customer, which was greater than MISA's cost price. The cost of such insurance (as well as shipping and related charges) was itemized in the total paid by MISA to petitioner and in the total paid by MISA's customer to MISA. The petitioner's method of fixing export prices was to first establish a base price in order that it could be sure of making a profit. Transportation and insurance necessarily had to be listed separately because of varying costs resulting from the shipping destination and the manner of shipment.

The above-mentioned insurance policy covered EWAC and all its subsidiaries, including the petitioner. Under the terms of the policy, insurance attached from the time the goods left petitioner's warehouse until the goods were delivered to the final warehouse at the destination named in the policy, certificate, or declaration. The insurance certificate issued with respect to an individual shipment named the petitioner as the shipper and consignee and showed the destination of the goods as the port of entry where the goods were to be delivered to the customer. It provided that any loss was to be paid to the order of the petitioner. In the case of an insurance claim, the petitioner would make application to have the loss paid to it. Such recoveries were

small and the recoveries would be placed in petitioner's bank account and would be credited to insurance recoveries. At the close of the year recoveries were netted off against insurance expense. In one instance an insurance loss check dated November 16, 1954, in the amount of $35.60, which was payable to the petitioner, was endorsed over by the petitioner to MISA.

Sales invoices sent by the petitioner to MISA and to MISA's customers provided that title to all materials shipped should remain in the petitioner until arrival at the place of destination.

The petitioner made every effort to assist its distributor MISA with respect to promotion, development, and sale of products. The petitioner's executives made several trips through Latin America and lectured. Literature was prepared in Spanish and Portuguese and this was furnished to MISA. MISA's salesmen were thoroughly trained and retrained in a school maintained by the petitioner in Flushing, New York. On several occasions specialists were sent by petitioner to South America to aid and assist MISA.

For the purpose of this case, all sales made by petitioner to others than MISA during petitioner's taxable years ended October 31, 1950, to October 31, 1956, inclusive, were accomplished in the same form as sales made to MISA during such period.

Petitioner did not pay any income taxes, or taxes in lieu thereof, to any country other than the United States during any of the taxable years involved herein.

During each of the petitioner's taxable years ending October 31, 1950, and October 31, 1951, all the facts with respect to the source of petitioner's gross income and the method of operating its business were, for purposes of this case, the same as during petitioner's taxable year ended October 31, 1952.

In its income tax returns for the fiscal years ended October 31, 1952, 1953, and 1954, the petitioner claimed as credits for Western Hemisphere trade corporations the respective amounts of $20,456.91, $2,306.63, and $8,402.68. In its returns for the fiscal years ended October 31, 1955 and 1956, the petitioner claimed special deductions for Western Hemisphere trade corporations in the respective amounts of $12,515.12 and $40,868.40.

In the notice of deficiency the respondent held that the petitioner was not a Western Hemisphere trade corporation and, therefore, disallowed the credits and special deductions claimed by the petitioner.

Title to all the goods sold by the petitioner during the years in question passed in foreign countries in the Western Hemisphere, and all the income derived by the petitioner from such sales was from sources outside the United States.

OPINION.

In support of his determination that the petitioner does not, during the years in question, qualify as a Western Hemisphere trade corporation within the meaning of section 109 of the Internal Revenue Code of 1939 and section 921 of the Internal Revenue Code of 1954,[1] the respondent makes substantially the same contentions as were advanced by him in *Barber-Greene Americas, Inc.*, 35 T.C. 365, on appeal (C.A. 7). He does not question that all of petitioner's business was done in countries in the Western Hemisphere and that at least 90 percent of its gross income was from the active conduct of a trade or business. However, he does contend that 95 percent or more of petitioner's gross income was not derived from sources outside the United States, as required by the statutory provisions. It is argued that the petitioner retained bare legal title to the goods shipped to MISA until delivery in the foreign countries in the Western Hemisphere, that this was done primarily for tax avoidance purposes, and that such retention of bare legal title does not serve to prevent the equitable title or beneficial ownership and general property in the goods from passing to the buyer within the United States. It is also argued that within the intendment of the statute the petitioner would have to be present and conducting some business within the foreign countries of

---

[1] Section 109 of the 1939 Code provides:

"For the purposes of this chapter, the term "western hemisphere trade corporation" means a domestic corporation all of whose business is done in any country or countries in North, Central, or South America, or in the West Indies, or in Newfoundland and which satisfies the following conditions:

"(a) If 95 per centum or more of the gross income of such domestic corporation for the three-year period immediately preceding the close of the taxable year (or for such part of such period during which the corporation was in existence) was derived from sources other than sources within the United States; and

"(b) If 90 per centum or more of its gross income for such period or such part thereof was derived from the active conduct of a trade or business."

Section 921 of the 1954 Code is, insofar as here material, substantially identical.

Section 26(i) of the 1939 Code provides:

(1) WESTERN HEMISPHERE TRADE CORPORATIONS.—In the case of a western hemisphere trade corporation (as defined in section 109)—

\* \* \* \* \* \* \*

(2) TAXABLE YEARS BEGINNING AFTER MARCH 31, 1951, AND BEFORE APRIL 1, 1954.—In the case of a taxable year beginning after March 31, 1951, and before April 1, 1954, an amount equal to 27 per centum of its normal-tax net income computed without regard to the credit provided in this subsection.

(3) TAXABLE YEARS BEGINNING AFTER MARCH 31, 1954.—In the case of a taxable year beginning after March 31, 1954, an amount equal to 30 per centum of its normal-tax net income computed without regard to the credit provided in this subsection.

Section 922 of the 1954 Code provides:

SEC. 922. SPECIAL DEDUCTION.

In the case of a Western Hemisphere trade corporation there shall be allowed as a deduction in computing taxable income an amount computed as follows—

(1) First determine the taxable income of such corporation computed without regard to this section.

(2) Then multiply the amount determined under paragraph (1) by the fraction—

(A) the numerator of which is 14 percent, and

(B) the denominator of which is that percentage which equals the sum of the normal tax rate and the surtax rate for the taxable year prescribed by section 11.

the Western Hemisphere to establish that the source of its sales income was without the United States.

In *Barber-Greene Americas, Inc., supra,* we thoroughly considered and rejected these various arguments and contentions of the respondent. We there held that the creation of a subsidiary for the purpose of making sales of goods in foreign Western Hemisphere areas in an attempt to qualify as a Western Hemisphere trade corporation does not constitute tax avoidance; that the statute does not require that a corporation, to qualify, must maintain a foreign warehouse or factory or pay foreign taxes; and that if the domestic corporation has agreed with its foreign buyers that title will be retained until the goods reach a foreign port, the agreement is controlling, and that the income thereunder is to be considered as being from sources without the United States, unless the retention of title is a mere sham. The same conclusions were reached by the Court of Claims in *A. P. Green Export Co.* v. *United States,* 284 F. 2d 383. See also *International Canadian Corp.* v. *Frank,* — F. Supp. — (W.D. Wash.) (Mar. 29, 1961).

In the instant case there can be no question that it was the intention of both the petitioner and its distributor that title to the goods should remain in the petitioner until delivery of such goods at the foreign ports. The basic contract, as well as each invoice, so provided, and the basic contract provided that risk of loss until arrival at destination should remain in the seller. The petitioner carried insurance against loss during transit. The fact that the petitioner charged MISA a basic price plus insurance and freight (c.i.f.) does not, under present circumstances, indicate that title passed in the United States. *Barber-Greene Americas, Inc., supra,* and *A. P. Green Export Co., supra.* Cf. *United States* v. *Balanovski,* 236 F. 2d 298 (C.A. 2). Here, as was true in *Barber-Greene Americas, Inc., supra,* the petitioner undertook real responsibilities, risks, and obligations in retaining title until delivery of the goods to the foreign port and its retention of title was real.

We have found, and hold, that title to the goods sold by petitioner passed in foreign places and that the income from such sales was from sources outside the United States. Following *Barber-Greene Americas, Inc., supra,* we hold that the petitioner qualified as a Western Hemisphere trade corporation for each of the years in question. Cf. *American Food Products Corporation,* 28 T.C. 14. It follows that the respondent erred in disallowing the credits claimed pursuant to section 26(i) of the 1939 Code and the special deductions claimed pursuant to section 922 of the 1954 Code.

*Decisions will be entered under Rule 50.*