Hammond Organ Western Export Corporation v. Commissioner.Hammond Organ Western Export Corp. v. CommissionerDocket Nos. 82005, 83931.United States Tax CourtT.C. Memo 1963-91; 1963 Tax Ct. Memo LEXIS 254; 22 T.C.M. (CCH) 426; T.C.M. (RIA) 63091; March 28, 1963*254 Held, petitioner qualified as a Western Hemisphere trade corporation. Barber-Greene Americas, 35 T.C. 365, and Pan American Eutectic Welding Alloys Co., 36 T.C. 284, followed. Ira T. Wender, Esq., One N. La Salle St., Chicago, Ill., Roger M. Quinnan, Esq., and Donald W. Underwood, Esq., for the petitioner. Theodore W. Hirsh, Esq., and Helen A. Viney, Esq., for the respondent. TRAINMemorandum Findings of Fact and Opinion TRAIN, Judge: Respondent determined deficiences in petitioner's income tax liability for the years and in the amounts as follows: FY EndedDkt. No.Deficiency3-31-5482005$87,660.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,711.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,458.943-31-578393154,017.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,861.21The sole issue for decision is whether petitioner qualified as a Western Hemisphere trade corporation under section 109 of the Internal Revenue Code of 1939 for the taxable year ended March 31, 1954, and section 921 of the Internal Revenue Code of 1954 for the taxable years ended March 31, 1955, 1956, 1957 and 1958. Findings of Fact Some of the facts are stipulated and are hereby found as stipulated. Petitioner was incorporated under the laws of the State of Delaware on May 29, 1952, under the name Hammond Instrument *255 Western Export Corporation, which name was duly changed to Hammond Organ Western Export Corporation (hereinafter sometimes referred to as Export) in February 1954. Petitioner's principal office is located at 4200 West Diversey Avenue, Chicago, Illinois. Export kept its books and filed its Federal income tax returns for the taxable periods involved on an accrual method of accounting. Export filed its Federal income and excess profits tax returns for the fiscal year ended March 31, 1954, and its Federal income tax returns for the fiscal years ended March 31, 1955, through March 31, 1958, with the district director of internal revenue at Chicago, Illinois. Hammond Organ Company (hereinafter referred to as HOC) is a corporation organized under the laws of the State of Delaware with its principal place of business at 4200 West Diversey Avenue, Chicago, Illinois. HOC is engaged in the invention, development, manufacture and sale of electrical musical instruments. HOC's products were sold under the brand name "Hammond organ." HOC sold these instruments to customers in the United States as well as in foreign countries. Sometime prior to May 1952, HOC became dissatisfied with its Canadian *256 distributor, Northern Electric Company, Limited (hereinafter referred to as Northern). The source of HOC's dissatisfaction stemmed from the volume of sales in Canada. In addition, the Canadian dealers who purchased Hammond organs from Northern were generally dissatisfied because they felt that Northern was not organized to distribute these organs effectively. The management of HOC' was aware of the tax advantages available to a Western Hemisphere trade corporation. Subsequently, management investigated the possibility of forming a new corporation to help solve the distribution problems in Canada which would also qualify as a Western Hemisphere trade corporation. On May 6, 1952, at a meeting of the board of directors of HOC, a resolution was adopted, which provided, in part, as follows: RESOLVED, That this Corporation cause the incorporation under the laws of Delaware of a corporation to conduct business as a Western Hemisphere Trade Corporation as defined by the federal Internal Revenue Code, and BE IT RESOLVED FURTHER, That such corporation be organized under the name of Hammond Instrument Western Export Corporation, * * *. On May 29, 1952, a certificate of incorporation was issued *257 to Export by the State of Delaware providing, in part, as follows: THIRD. The nature of the business, or objects or purposes to be transacted, promoted or carried on are: To manufacture, produce, purchase, import or otherwise acquire, own, hold, use, sell, export, or otherwise dispose of, and generally deal in and with musical instruments and other goods, wares and merchandise of all kinds within the geographical limits of North, Central or South America, or in the West Indies or in Newfoundland, as a Western Hemisphere Trade Corporation. The management of HOC understood that in order for Export to qualify as a Western Hemisphere trade corporation, Export would be required to derive at least 95 percent of its income from sources outside of the United States but within the Western Hemisphere. It was management's understanding that Export could meet this requirement by retaining title, assuming all of the risk of loss or damage in transit, until the goods had been delivered to the ultimate buyer located in the Western Hemisphere. It was management's understanding that the effect of selling in this manner would be that Export would be responsible for all loss or damage of goods in transit, *258 and that no sale would be consummated until the merchandise, in good condition, had been delivered to the customer. It was the intent of the management that Export assume this risk of loss or damage. During the taxable years, petitioner's business consisted of purchasing Hammond organs exclusively from HOC and reselling these organs to customers located in North, Central and South America, the West Indies, and Newfoundland. Export did not have any officers or agents located outside of the geographical limits of North, South and Central America, and the West Indies. Export did not buy from or sell to any persons located in countries outside of the Western Hemisphere. In the spring of 1952 and after organization of Export, management informed Victor Walz (hereinafter referred to as Walz), export manager of HOC, that Export had been formed. Walz was instructed that Export was to sell Hammond organs to dealers in Latin America and Canada and was to retain title to the organs until they arrived at the port of entry and that he was to obtain an agreement to this arrangement from the dealers. In June 1952, Walz was appointed sales manager of Export. Shortly thereafter, an announcement letter *259 was sent to all existing Hammond organ dealers in Latin America and the one distributor in Canada informing them of the formation of Export. Prior to this time, the dealers in Latin America and the Canadian distributor had dealt with HOC. On July 24, 1952, the following letter was sent to Hammond organ dealers in South and Central America and the West Indies: Hammond Instrument Western Export Corporation, 4200 West Diversey Avenue, Chicago 39, Illinois, U.S.A.Cable Address "HIWEC" Chicago July 24, 1952 Gentlemen: Effective May 29th, 1952, you are appointed a dealer for the Hammond Organ Models Rt-2, C-2, B-2 and M-2 and the Model L Solovox. This appointment conveys to you the right to purchase these instruments from us at prices prevailing at time of purchase and to resell them to consumers in…. It is required by our company's by-laws that this corporation retain legal title to the merchandise until it reaches a port of entry in your country or your warehouse. Accordingly, we will consign merchandise to ourselves and assume all risks to the merchandise until title is passed. To this effect, it must be agreed that the ownership of, the legal title to, and the right to possession of *260 and control over the merchandise will remain with this company until the shipment actually reaches a port of entry in your country or your warehouse. The time, method, place or medium of payment, the method of shipment, whether by air, rail, maritime freight or parcel post, or by a combination of any two or more of them; the manner of consignment, whether to ourselves, to you, to your agent, or to an agent for both of us, should not in any way limit or modify the rights of this company as the legal owner of the goods, to have control over and the right to possession of them during the course of shipment and until they reach your warehouse. It is your responsibility to vigorously promote the sale of these Hammond instruments in your country and to arrange for proper installation and servicing of Hammond instruments including service without charge under the terms of our factory guarantee. Very truly yours, Hammond Instrument, Western Export CorporationVAW/je V. A. Walz Sales Manager On July 24, 1952, a letter was also sent to Northern. The letter was similar in every respect to the one sent to Export's other dealers except that it appointed Northern a distributor for the organs listed *261 rather than a dealer. In appointing Northern as a distributor Export merely continued the relationship which HOC had had with Northern. Because HOC and the Canadian dealers had become dissatisfied with the Northern distributorship arrangement, Export decided not to include a new chord organ, which was being introduced at that time, in the new agreement with Northern. Export decided to offer the chord organ direct to the Canadian dealers. In the autumn of 1952, Walz made a series of trips to Canada for the purpose of introducing the new chord organ and to acquaint the existing Hammond organ dealers in Canada with the formation of Export. He also sought to appoint Canadian dealers for the new chord organ, and to acquaint them with the ordering procedure that was to be used. During his trips to Canada in the autumn of 1952, Walz discussed with the Canadian dealers the manner in which Export proposed to ship to Canada and what significance it had. He explained to the dealers that the retention of title and responsibility for loss or damage in transit by Export was an advantage to the dealer. This was understood by the dealers and they agreed to Export retaining title and being responsible *262 to deliver the goods in good salable condition to Canada. At the same time, Walz explained to the dealers the need for an endorsing agent and asked for their cooperation in finding a suitable candidate. He suggested that the endorsing agent could be a customs broker with whom the dealer did business. The dealers cooperated with Export in establishing endorsing agents of Export in the dealers' countries for the purpose of endorsing controlling documents and other evidence of title for Export. Where no other agents were available, employees of the dealers agreed to act as agents of Export in the dealers' countries for this purpose. In November of 1952, after Walz returned from his visits to the Canadian dealers, Export sent out a letter to the following persons confirming each of their appointments as a dealer for the chord organ: DealerLocationChas. Hutton & Sons.St. John's NewfoundlandWillis & Co., Ltd.Montreal, P.Q., CanadaHeintzman & Co., Ltd.,Toronto, Ontario, CanadaMoore's Ltd.Sault Ste. Marie, OntarioHudson's Bay Co.Vancouver, B.C.J. W. Kelly Piano Co., Ltd.Vancouver, B.C.The T. Eaton Co.Montreal, P.Q.The T. Eaton Co.Winnipeg, ManitobaThe T. Eaton Co.Saskatoon, Sask.T. Eaton Co., Ltd.Victoria, B.C.*263 On February 9, 1953, Export sent a letter to all Canadian Hammond chord organ dealers. The letter gave instructions relating to ordering and shipping procedures to be followed, correspondence regarding new owners of Hammond organs, and servicing and pricing of the chord organs. The instructions were, in part, as follows: All orders for Chord Organs should be addressed to the HAMMOND INSTRUMENT WESTERN EXPORT CORPORATION and the following legend should be inserted on the purchase order: "It is understood that legal title to the goods specified in this purchase order is to remain with the vendor until the shipment reaches the port of entry in Canada." Throughout the period June 1952 to March 31, 1958, the sales manager and assistant sales manager of Export made trips to various places where dealerships were lacking. Prospective dealers were interviewed to ascertain what interest they might have in selling Hammond organs and to determine what qualifications the merchant had from Export's point of view. At times during these visits, a merchant would be appointed a dealer and this would be confirmed in writing after the sales manager or assistant sales manager returned to Export's office *264 in Chicago. Usually every potential dealer was personally visited by the sales manager or assistant sales manager before the dealership was granted. The only dealers that were not personally visited by employees of Export prior to their appointment were dealers located in small places in Latin America where it was not practical because of the potential market. From June 1952 through March 31, 1958, Export promoted sales of Hammond organs in Canada, South and Central America, and the West Indies. Export supplied sales literature in English, Spanish and French to its dealers, sales material, window material, motion picture films and records as well as periodicals, the "Hammond Times" and the "Chord Organ Comments" which went regularly to the dealers to help them promote organ sales. Export also arranged for professional demonstrations and concerts on Hammond organs in Canada and Latin America by Porter Heaps and Mario Salvador and coordinated these demonstrations and concerts with the sales efforts to Hammond organ dealers in those countries. Beginning sometime in 1956, Export advertised Hammond organs in Canadian publications of national scope, and often in French publications to cater *265 to the French speaking element of the Canadian population. During the period June 1952 to March 31, 1958, Export conducted a service training school in Winnipeg, Canada, and gave a series of lectures and demonstrations to the Canadian dealers over a period of several days. Export occasionally rented hotel rooms, display space, and meeting halls in the dealers' countries for the purpose of concerts, service training schools and demonstrations. Throughout the period June 1952 to March 31, 1958, Export sent service technicians to Canada to work with dealers and to help them with the servicing and installation of Hammond organs. Throughout the period June 1952 to March 31, 1958, the sales manager and assistant sales manager of Export made trips to the dealers' places of businesses, spending generally a full day with each dealer and on some occasions a longer period, instructing them in the promotion and retail selling of Hammond organs. By agreement, the distributorship arrangement with Northern was terminated on June 30, 1954. Northern agreed to invite its Hammond organ dealers to terminate their franchise agreements effective June 30, 1954, or absent such agreement, to terminate the *266 dealers' franchise not later than September 30, 1954. On June 30, 1954, Export sent the following letter to the Canadian Hammond organ dealers of Northern: The decision has been made by the Northern Electric Company, Ltd. and the Hammond Organ Western Export Corporation that distribution of the Hammond Organ in Canada is to be taken over by Hammond direct from Chicago, effective July 1, 1954. It is our intention to offer our Hammond Organ franchise to Canadian music dealers of our choice, during the course of the next few months. Dealers will be appointed following discussion and agreement regarding their retail merchandising responsibilities. During the interim period, between July 1, 1954, and appointment of dealers, we will supply you with Hammond Organ equipment, in order to maintain continuity of Hammond sales in your area. This offer does not obligate us to give our franchise or to continue selling Hammond Organ equipment to any dealer because he has had the Northern Electric Hammond Organ franchise. You may place your orders with Hammond Organ Western Export Corporation at any time, but shipment will not be made until prices are announced which will be shortly after July 1. *267 The "legal title" legend, familiar to you in your Chord Organ business, should be inscribed on your purchase orders. This change in distribution of our products in Canada is a means of substantially increasing your business, and we believe you will welcome it. At various times between May 21, 1954, and October 1, 1957, Export appointed an additional 36 dealers in Canada. The letter making each appointment contained specific statements to the effect that the right to purchase Hammond organs from Export was on the condition that title to the organs shipped was to remain with Export until the shipment reached the port of entry in Canada. All letters sent out on and after August 24, 1956, contained the following statement: PASSAGE OF TITLE - The Hammond Western Export Corporation will assume all risks to the merchandise from warehouse to warehouse, and accordingly shall retain title to the goods until shipment reaches a designated port of entry or your warehouse. It is agreed that the ownership of, the legal title to, and the right of possession of and control over the merchandise which is the subject matter of this franchise shall remain with Hammond Organ Western Export Corporation until *268 this shipment actually reaches a designated port of entry or your warehouse. The time, method, place or medium of payment; the method of shipment, whether by air, rail, truck, maritime freight or parcel post, or by a combination of two or any more of them; the manner of consignment, whether to the seller, its agent, the purchaser or its agent, or to an agent for both, shall not in any way limit or modify the right of Hammond Organ Western Export Corp., as the legal owner of the goods, to have control over and the right to possession of them during the course of shipment and until they reach a designated port of entry or your warehouse. Prior to January 1957, the letters sent out by Export to dealers in North, South and Central America and the West Indies were the only formalized or written communications of Export to those dealers regarding the purchase of Hammond organs. Prior to January 1957, there were no written bilateral agreements signed by both Export and their dealers. The reason for this was the experience HOC had had with Northern. Export was reluctant to enter into formal contracts until there had been sufficient opportunity to evaluate the merits of the dealers and the *269 agreement with Northern had been terminated. Export entered into formal contracts of agreement with the following Hammond organ dealers, on the following dates: Compania Alfaro, S.A., Panama1-28-57Booker Stores, Ltd., British Guiana2- 7-57Bert A. Cambridge, Bahamas1-22-57Casa Musical Limited, Costa RicaAug. 1957Carlos Doggenweller Sets, Chile3-12-57Dominican Motors Company, Domini-can Republic1-22-57Cia. Electric de Cuba. Cuba1-24-57Corporation Electro Bolivinia, Bolivia1-25-57Graupner & Ghiraldini, Ltd., Brazil1-23-57J. Glottman, S.A., Columbia1-22-57Walter Huppke, Honduras2- 1-57Instrumentales Musicales, S.A., Gua-temala1-30-57Salvador R. Nin, Inc., Puerto Rico1-23-57Schiefer Hnos., S.A., Mexico1-28-57A. C. Shumway, Peru1-21-57H. R. Tippenhauer, Haiti1-21-57 Each of the foregoing agreements contained the following language: This is to confirm our previous oral and written agreement regarding the terms of sale for Hammond Organ equipment sold by us to you in your country. The statement which follows regarding passage of title is therefore understood to be part of every transaction between us involving the sale of Hammond Organs. Passage of title. Hammond Organ Western Export Corporation*270 will assume all risks to the merchandise from warehouse to warehouse, and accordingly shall retain title to the goods until the shipment reaches a designated port of entry or your warehouse. It is agreed that the ownership of, the legal title to, and the right of possession of and control over the merchandise which is the subject matter of this contract shall remain with Hammond Organ Western Export Corporation until the shipment actually reaches a designated port of entry or your warehouse. The time, method, place or medium of payment; the method of shipment, whether by air, rail, truck, maritime freight or parcel post, or by a combination of any two or more of them; the manner of consignment, whether to the seller, its agent, the purchaser or its agent, or to an agent for both, shall not in any way limit or modify the rights of Hammond Organ Western Export Corporation, as the legal owner of the goods, to have control over and the right to possession of them during the course of shipment and until they reach a designated port of entry or your warehouse. In addition to its dealers, Export had agents located in the various countries to which its goods were shipped, who were authorized *271 on behalf of Export and had agreed to endorse or otherwise handle shipping documents such as bills of lading, insurance certificates, etc. The form letter generally used in appointing endorsing agents and obtaining their agreements to act as such for Export contained the following language: We hereby constitute and appoint you as our endorsement representative for the sole and limited purpose of endorsing bills of lading and insurance certificates and writing delivery orders addressed to air carriers and postmasters at various locations in your country, instructing and authorizing them to deliver to customers air express shipments or parcel post packages which will be shipped to the undersigned as consignee. Please indicate your acceptance of this appointment by signing and returning a copy of this letter. Procedures with respect to Export's sales can be summarized as follows: (a) Orders: (1) Orders were received by Export from the dealer specifying the model or models of the Hammond organ wanted. (2) Orders on occasion specified the method of shipment or the carrier. (3) Orders were received in a purchase order form, cable, telegram, letter, by phone and orally. (4) Written orders *272 contained a statement providing as follows: It is understood that the legal title to the goods contained in this purchase order shall remain with the vendor until the shipment reaches the port of entry. (5) If the written order did not contain the statement respecting title, the order was returned to the dealer, requesting that the order be replaced with the statement on it. (b) After receipt of the dealer's order, Export placed its order for the organ or organs with HOC. (c) Acknowledgments: (1) At the same time Export placed its order with HOC, it prepared and sent a letter to the dealer acknowledging his order for the specific organ. (2) All acknowledgments sent to dealers in Central and South America and the West Indies contained the following statement: The legal title to the merchandise specified in this order acknowledgment shall remain with the vendor until the shipment reaches the port of entry. (3) All acknowledgments sent to dealers in Canada contained the statement respecting title except that an occasional acknowledgment may not have contained the statement. (d) Invoices: (1) When the merchandise was delivered to Export for shipment, Export prepared the commercial invoice. *273 (2) The commercial invoice designated the carrier, directed shipment to Export or its agent or to their order in the dealer's country, and the party to be notified. (3) The commercial invoice designated the buyer, the destination of the shipment, the specific goods, the price and price terms. (4) The commercial invoice issued by Export contained the following statement: The legal title the merchandise specified in this invoice shall remain with the vendor until the shipment reaches the port of entry. (e) After the invoice was prepared, Export delivered the goods to the inland carrier for shipment and received a bill of lading which identified the goods, consigned the shipment to Export or its agent, or their order, in the dealer's country and contained a statement respecting title to the merchandise in transit. (f) A typical statement respecting title to merchandise in transit as was placed on the bills of lading is as follows: The legal title to the merchandise specified in this B/L shall remain with the vendor until the shipment reaches the port of entry in Canada. (g) After receipt of the bill of lading, Export prepared a shipper's export declaration to be filed with the collector *274 of customs. (h) The shipper's export declaration prepared by Export contained the following information: Designated the carrier, Designated Export as the exporter, Designated the ultimate consignee, Place and country of ultimate destination, Specified the merchandise, quantity and value. (i) At the same time that Export prepared the shipper's export declaration it prepared a notice of transfer of title and mailed it, with the bill of lading and commercial invoice to the endorsement agent in the dealer's country with instructions to endorse the bill of lading, transfer the shipping documents to the dealer and sign and date the notice of transfer of title and return it to Export. (j) The following is an example of a typical notice of transfer of title: NOTICE OF TRANSFER OF TITLE W01827 Gentlemen: This is notice that we have endorsed the bill of lading covering your invoice No. W-01827, sold to the T. Eaton Co., Ltd., Victoria, B.C., Canada, and that title for this merchandise is transferred to them on this date. Very truly yours, Thomas Meadows & Co. Canada Ltd. signed A. G. PROCTOR Toronto, Ontario Canada (k) After receipt of the bill of lading and other documents from Export, the *275 endorsing agent endorsed the bill of lading and forwarded it, with the other documents to the dealer, as per instructions, and returned a signed and dated notice of transfer of title to Export. (l) At the end of the month in which Export received the signed notice of transfer of title, it recorded the sale on its books as having been completed. On shipments to Canadian dealers, in addition to other shipping documents, Export prepared a Form "M.-A." which is filed with the Canadian customs when the goods are withdrawn from customs. The Form "M.-A." as prepared by Export for shipments to Canada, specified the purchaser, the seller, the carrier, price and price terms, identified the merchandise, indicated that the shipment was addressed to Export in care of its agent, or to its agent, or to their order, notify the dealer and contained a statement respecting title to the merchandise. A typical statement respecting title to merchandise specified in a Form "M.-A." as prepared by Export was as follows: The legal title to the merchandise specified in this invoice shall remain with the vendor until the shipment reaches the port of entry in Canada. After preparing the Form "M.-A.", Export sent *276 it, with the commercial invoice, shipping documents, and notice of transfer of title to its agent in Canada for forwarding to the dealer. On ocean shipments, Export's procedure was the same as the foregoing with the following variations: (a) After receipt of the inland bill of lading from the inland carrier, Export forwarded it with the shipper's export declaration, the commercial invoice, packaging list and insurance certificate to the freight forwarder with instructions. (b) The instructions sent the freight forwarder provided: (1) Instructions to forward the shipment covered by commercial invoice and other documents to destination. (2) The ocean bill of lading should specify Export as the shipper, consign the goods to Export in care of its agent, or to its agent, or to their order, notify the dealer, and contain a statement respecting title to the merchandise. (3) A typical instruction to insert the statement respecting title to merchandise on an ocean bill of lading is as follows: SPECIAL INSTRUCTIONS: Insert the following legend on the ocean bills of lading. "The legal title to the merchandise specified in this B/L shall remain with the vendor until the shipment reaches the port *277 of entry in Aruba. Schedule B. No. is 923100. General License GRO. Do not endorse the ocean bills of lading nor the insurance certificates." (4) Instructions given the freight forwarder also directed him to deliver all documents to Export's agent in the dealer's country. (5) In some transactions the freight forwarder was requested to fill out the insurance certificate sent him and to return a copy to Export along with copies of other documents. (c) The freight forwarder forwarded the goods to the destination in accordance with Export's instructions and sent the documents to Export's agent in the dealer's country. (D) After receipt of copies of the ocean bill of lading and insurance certificate from the freight forwarder, Export sent a letter of authority and notice of transfer of title to its agent in the dealer's country. (e) The following is a typical letter of authority: LETTER OF AUTHORITY Gentlemen: We hereby constitute and appoint you as our endorsement representative for the sole and limited purpose of endorsing bills of lading and insurance certificates accompanying our draft W-255. These documents should be endorsed like this: HAMMOND INSTRUMENT WESTERN EXPORT CORPORATIONBY: *278 (Its duly authorized agent in this behalf) Please sign and date the attached NOTICE OF TRANSFER OF TITLE and airmail it to us. (f) After Export's agent received the ocean bill of lading, commercial invoice, insurance certificate and shipping documents from the freight forwarder, the agent endorsed the bills of lading and insurance certificate, forwarded the documents to the dealer, and signed and dated the notice of transfer of title and returned it to Export. If the goods were shipped by air, the sales procedures of Export were the same as with an ocean shipment, except for the following variations: (a) Export prepared a duplicate delivery order form and sent it to the agent in the dealer's country with instructions to execute the delivery order upon receipt of the controlling documents from the freight forwarder, deliver the shipping documents and one copy of the delivery order to the dealer and return one copy to Export. (b) The following is a typical example of a delivery order prepared by Export and sent to its agents. DELIVERY ORDER W-486 Gentlemen: Will you please deliver the shipment identified by your Airwaybill No. A 284527 to Mario Bolanos & Company, Apartado 345, Guatemala*279 City, who is the owner of the same. He will assume all charges including duties and transportation charges. (c) On some air shipment transactions, Export forwarded a notice of transfer of title to be executed by the agent in the dealer's country instead of a duplicate delivery order. (d) The notice of transfer of title which Export sent to its agent in the dealer's country on air shipments was similar in all respects to a notice of transfer of title on inland shipments except that the endorsement was of the delivery order rather than a bill of lading. If the payment terms for a shipment of goods called for a sight draft or letter of credit, the sales procedures of Export were similar to an ocean or air shipment except for the following variations: (a) Export directed the freight forwarder to forward the shipping documents to Export's bank in the United States. (b) Export forwarded a copy of the commercial invoice, a letter of authority and a notice of transfer of title, or a delivery order, depending on the methods of shipment, and a bank draft to its U.S. bank with instructions to collect the invoice amount for Export's account, and gave the bank instructions of how the invoice was *280 to be collected. (c) Export's letter to its bank contained the following instructions: (1) The drawee. (2) The shipping documents should be sent to Export's agent or the collecting bank in the dealer's country. (3) The collecting bank in the dealer's country if any. (4) Directed that the collecting bank or the agent in the dealer's country was to endorse the bills of lading and insurance certificates in accordance with the letter of authority, sign and return the notice of transfer of title to Export after endorsement of the documents. (d) The U.S. bank forwarded the documents received from the freight forwarder and Export's draft and letters to the collecting bank in the dealer's country with instructions to collect the draft drawn by Export on the dealer, endorse the bill of lading or the delivery order, and to sign the notice of transfer of title or a duplicate delivery order and return a copy to Export. (e) The collecting bank or agent in the dealer's country endorsed the documents in accordance with the instructions, signed the notice of transfer of title or duplicate delivery order, and remitted the proceeds of the draft to the U.S. for Export's account with its bank. (f) If *281 the draft was not to be forwarded to a foreign collecting bank, the U.S. bank held the shipping and controlling documents until the draft was paid, released the unendorsed shipping and controlling documents to the dealer's country for endorsement. After the agent endorsed the documents, the dealer took possession of the merchandise at the port of entry to his country and the agent signed the notice of transfer of title or delivery order and returned them to Export. Export viewed the signed notice of transfer of title received from its agents as an indication that the sale was completed and the transaction closed. If Export had not received the notice of transfer of title for a shipment to a dealer, the goods were considered to be in transit. Goods in transit were considered to be Export's property and were included in its inventory on its books of account and its tax returns. Export's insurance coverage for shipments to Canada was under a blanket policy. Insurance coverage on other shipments was under Marine Open Cargo Policy. The assured was HOC and/or Export. The insurance policy specified "Loss, if any, payable to Assured or order." The amount of insurance on each shipment as provided *282 by the policy was the invoice price and freight and other charges, plus ten percent thereon. The coverage of the policy was from shipper's warehouse to purchaser's warehouse. The following schedule indicates the damage claims recovered by Export under its insurance policy for the period May 30, 1952, through March 31, 1958: Date PaidAmountNature of ClaimMay 1952$ 34.65ShortageApril 1953123.26Handling DamageJanuary 195433.00Handling DamageFebruary 19561,771.00Fire LossApril 195641.51Scratched anddentedApril 1956328.03BreakageFebruary 195891.58General average -Steamer's Ma-chinery Dam-agedOn March 27, 1957, a model M-3 organ was shipped by Export to Tampa, Florida, for delivery to Instrumentos Musicales, S.A., Guatemala. The organ remained in the United States and was not shipped to Guatemala. On May 15, 1957, this fact was conveyed to R. H. Nelson, the person generally responsible for the accounting matters of Export. The transaction was transferred to the books of HOC and eliminated from the books of account of Export. The sales price of the organ was $840. The above shipment of March 27, 1957, was the only sales transaction which was eliminated from the books of account of Export *283 throughout the period May 29, 1952, through March 31, 1958. Export's sales, cost of sales, and gross profit on sales of Hammond organs for the fiscal periods ended March 31, 1953, through March 31, 1958, as per its books and records, were as follows: FYGrossEndedCost ofProfit3-31SalesSaleson Sales1953$ 372,553.86$205,954.11$166,599.751954638,528.56354,517.06284,011.501955$ 763,607.80$425,342.01$338,265.7919561,045,468.74562,711.66482,757.0819571,054,480.40590,074.49464,405.9119581,336,248.36744,135.25592,113.11 The following schedule indicates Export's other income for the taxable years ended March 31, 1953, through March 31, 1958, was as follows: Gain onSecurityFy EndedInterestFreight 1Insurance 2SaleTotal1953$ 89.29$ 89.291954$62.56123.64186.201955$ 450.95450.951956232.28232.2819575,274.7950.72106.30$46.875,478.6819585,965.0720.045,985.11In the notice of deficiency respondent determined that petitioner did not qualify as a Western Hemisphere trade corporation and, *284 therefore, disallowed the exemption, credits and special deductions claimed by petitioner under sections 454(b) and 26(i) of the 1939 Code and section 922 of the 1954 Code. All of petitioner's business was done in Western Hemisphere countries. Petitioner derived at least 90 percent of its gross income from the active conduct of a trade or business. During the taxable years, 95 percent or more of petitioner's gross income was derived from sources outside the United States. Opinion The issue is whether petitioner qualified as a Western Hemisphere trade corporation under section 1093*285 of the 1939 Code and section 921 of the 1954 Code. If petitioner qualifies, it is exempt from excess profits taxes pursuant to section 454(f) 4*286 of the 1939 Code and is entitled to the credit provided by section 26(i) 5 of the 1939 Code and the special deduction provided for in section 922 6*287 of the 1954 Code. The facts in the instant case are indistinguishable, except for minor and irrelevant points, from those in Barber-Greene Americas, 35 T.C. 365 (1960), and Pan American Eutectic Welding Alloys Co., 36 T.C. 284 (1961). The gravamen of respondent's position is that we reconsider our decisions in those cases. However, respondent has not presented anything that was not thoroughly considered in the aforementioned cases. 7*288 Barber-Greene Americas, supra, Pan American Eutectic Welding Alloys Co., supra, as well as A. P. Green Export Company v. United States, 284 F. 2d 383 (Ct. Cl., 1960), involved the qualification, as a Western Hemisphere trade corporation, of the export subsidiary of a domestic manufacturer created for the purpose of marketing goods in Western Hemisphere countries and doing so in such manner as to take advantage of the tax benefits provided by sections 109 of the 1939 Code and 921 of the 1954 Code. In each case the subsidiary had instituted sales procedures similar to those used by petitioner for the purpose of retaining title to the *289 goods sold until they reached a foreign destination point and then relied on the "title passage" test as a basis for claiming that its sales took place outside the United States. In each case respondent's arguments were rejected. The legal principles involved were summarized in Pan American Eutectic Welding Alloys Co., supra, at page 291: In Barber-Greene Americas, Inc., supra, we thoroughly considered and rejected these various arguments and contentions of the respondent. We there held that the creation of a subsidiary for the purpose of making sales of goods in foreign Western Hemisphere areas in an attempt to qualify as a Western Hemisphere trade corporation does not constitute tax avoidance; that the statute does not require that a corporation, to qualify, must maintain a foreign warehouse or factory or pay foreign taxes; and that if the domestic corporation has agreed with its foreign buyers that title will be retained until the goods reach a foreign port, the agreement is controlling, and that the income thereunder is to be considered as being from sources without the United States, unless the retention of title is a mere sham. The same conclusions were reached by the Court *290 of Claims, in A. P. Green Export Co. v. United States, 284 F. 2d 383. See also International Canadian Corp. v. Frank, - F. Supp. - (W.D. Wash.) (Mar. 29, 1961). We hold that petitioner qualifies as a Western Hemisphere trade corporation under section 109, 1939 Code and section 921, 1954 Code. Decisions will be entered for the petitioner. Footnotes1. The freight receipts represent adjustments between fiscal accounting periods. ↩2. It was the practice of Export, whenever possible, to add a percentage to the cost of insurance which was included in the cost of goods sold.↩3. SEC. 109. WESTERN HEMISPHERE TRADE CORPORATIONS. For the purposes of this chapter, the term "western hemisphere trade corporation" means a domestic corporation all of whose business is done in any country or countries in North, Central, or South America, or in the West Indies, or in Newfoundland and which satisfies the following conditions: (a) If 95 per centum or more of the gross income of such domestic corporation for the three-year period immediately preceding the close of the taxable year (or for such part of such period during which the corporation was in existence) was derived from sources other than sources within the United States; and (b) If 90 per centum or more of its gross income for such period or such part thereof was derived from the active conduct of a trade or business. Section 921↩ of the 1954 Code is, insofar as material herein, substantially identical. 4. SEC. 454. EXEMPT CORPORATIONS. The following corporations, except a member of an affiliated group of corporations filing a consolidated return under section 141, shall be exempt from the tax imposed by this subchapter: * * *(f) Domestic corporations satisfying the following conditions: (1) If 95 per centum or more of the gross income of such domestic corporation for the three-year period immediately preceding the close of the taxable year (or for such part of such period during which the corporation was in existence) was derived from sources other than sources within the United States; and (2) If 50 per centum or more of its gross income for such period or such part thereof was derived from the active conduct of a trade or business. 5. (i) Western Hemisphere Trade Corporations. - In the case of a western hemisphere trade corporation (as defined in section 109) - * * *(2) Taxable years beginning after March 31, 1951, and before April 1, 1954. In the case of a taxable year beginning after March 31, 1951, and before April 1, 1954, an amount equal to 27 per centum of its normal-tax net income computed without regard to the credit provided in this subsection. (3) Taxable years beginning after March 31, 1954. - In the case of a taxable year beginning after March 31, 1954, an amount equal to 30 per centum of its normal-tax net income computed without regard to the credit provided in this subsection. ↩6. SEC. 922. SPECIAL DEDUCTION. In the case of a Western Hemisphere trade corporation there shall be allowed as a deduction in computing taxable income an amount computed as follows - (1) First determine the taxable income of such corporation computed without regard to this section. (2) Then multiply the amount determined under paragraph (1) by the fraction - (A) the numerator of which is 14 percent, and (B) the denominantor of which is that percentage which equals the sum of the normal tax rate and the surtax rate for the taxable year prescribed by section 11.↩7. Respondent makes in essence three arguments. First, that the legislative history of section 109 of the 1939 Code and section 921 of the 1954 Code indicates that Congress did not intend to permit an export subsidiary to qualify as a Western Hemisphere trade corporation. Respondent contends that in order to qualify the corporation must be conducting an active trade or business in a foreign country. Second, he argues that because petitioner's sales procedures were established in a deliberate attempt to qualify for tax benefits available to Western Hemisphere trade corporations a determination as to the place where petitioner's sales took place must be based on so-called "substantive" criteria rather than on the place where title to the goods pass. Respondent contends that under the "substance of the sale" test petitioner did not derive 95 percent of its gross income from outside the United States. Third, respondent argues that petitioner's sales procedures were not such as to pass title to the goods sold by petitioner outside the United States. Thus, he contends that 95 percent of petitioner's gross income was not derived from sources outside the United States.